[Civ. No. 2867.  Third Appellate District.—January 31, 1925.]

## W. P. VERNON, Respondent, v. PLUMAS LUMBER COMPANY (a Corporation), Appellant.

[1] FALSE IMPRISONMENT—ACTION FOR DAMAGES—ARREST WITHOUT WARRANT—DELAY IN TAKING BEFORE MAGISTRATE.—In this action for damages, for and on account of four causes of action, two for unlawful arrests and two for malicious prosecution, from the evidence showing that defendant's agent, who arrested plaintiff without a warrant, instead of taking plaintiff before the nearest or most accessible magistrate, as required by section 849 of the Penal Code, placed him in the county jail, while the acting parties themselves went and consulted two attorneys and then repaired to the magistrate's office, the trial court properly concluded that there was an unnecessary delay in taking plaintiff before the committing magistrate and, therefore, that his imprisonment was wholly unwarranted; and the fact that the agents of defendant were ignorant of the provisions of said Penal Code section did not lessen their duty, nor obviate the results of the clear showing that plaintiff was unnecessarily confined in the county jail while deliberations were being had as to the further proceedings to be taken.

[2] ID.—RIGHT TO HEARING—UNREASONABLE DELAY.—A prisoner is entitled to a hearing within a reasonable time after his arrest, and a delay for an unreasonable time in bringing him before the magistrate for examination constitutes false imprisonment.

[3] MALICIOUS PROSECUTION—PROBABLE CAUSE—ADVICE OF COUNSEL—EVIDENCE—FINDINGS—APPEAL.—In an action for damages for malicious prosecution, where every element of the defense of advice of counsel and probable cause rests upon disputed facts, and the trial court finds upon conflicting evidence that the agents of defendant did not act either honestly or in good faith upon the advice of counsel, that defendant's agents did not state to said persons all the facts in the case, that defendant's agents were not

1. Actions for false imprisonment, when maintainable, notes, 54 Am. Dec. 258; 67 Am. St. Rep. 408; 118 Am. St. Rep. 719.

2. Delay in presenting prisoner for examination or trial as false imprisonment, notes, 13 Ann. Cas. 984; Ann. Cas. 1914A, 717.

3. Counsel's advice as defense to action for malicious prosecution, notes, 1 Ann. Cas. 932; 11 Ann. Cas. 954; Ann. Cas. 1912D, 423. See, also, 18 R. C. L. 47; 16 Cal. Jur. 741.

advised that a criminal prosecution would lie and that there was not probable cause for the prosecutions had, the conclusions of the trial court are conclusive upon appeal, even though there is testimony from which the trial court might have come to a different conclusion.

[4] ID.—ADVICE AS TO CIVIL RIGHTS—IRRELEVANT EVIDENCE.—In an action for damages for malicious prosecution, any advice given defendant concerning its civil or equitable rights would have no bearing on its criminal prosecution of plaintiff, and evidence of such advice is properly excluded.

[5] ID.—MISJOINDER—WAIVER OF OBJECTION.—In an action for damages, for and on account of four causes of action, two for unlawful arrests and two for malicious prosecution, the objection of misjoinder of actions is not available on appeal where it is not taken in the manner provided by section 434 of the Code of Civil Procedure.

[6] ID.—DAMAGES—DOUBLE AWARDS—SEPARATE OFFENSES.—On appeal from the judgment in such action, there is no merit in the contention that double awards were made, where the allegation of false imprisonment contained in plaintiff's complaint and in the testimony set forth in the transcript show two distinct arrests without warrants and imprisonment following each of said arrests and thereafter two other distinct arrests upon the issuing of warrants, and the damages claimed, found, and allowed by the trial court were for the imprisonments following the arrests made without warrants and, therefore, had nothing to do with the cause of action culminating in the charges of malicious prosecutions, which were based upon complaints and warrants and were separate and distinct from the previous false imprisonments, although they followed each other in successive events.

[7] ID. — INTENT OF DEFENDANTS' AGENT — PENALTY FOR CRIME CHARGED AGAINST PLAINTIFF.—In such action, in measuring the culpability of the intent of defendant's agents and what injuries they were attempting to inflict upon plaintiff, the trial court was entitled to take into consideration the fact that, had plaintiff been found guilty of the charges alleged against him, he might have been incarcerated in the county jail for a period of not exceeding six months or by a fine not exceeding the sum of five hundred dollars, or both.

[8] ID.—DAMAGES—MOTIVES OF TRIAL COURT—EVIDENCE—APPEAL.— In such action, trial having been had before the court sitting without a jury, the appellate court was not at liberty to

71 Cal. App.—8

assume that the trial court, in assessing damages, acted either from passion or prejudice or from any improper motive, in the absence of some showing to that effect.

---

(1) 25 C. J., p. 492, n. 74, p. 493, n. 83, p. 547, n. 20.    (2) 25 C. J., p. 492, n. 74.    (3) 4 C. J., p. 883, n. 33; 38 C. J., p. 499, n. 75.    (4) 38 C. J., p. 486, n. 5.    (5) 3 C. J., p. 748, n. 31.    (6) 25 C. J., p. 557, n. 27 New.    (7) 38 C. J., p. 450, n. 82 New.    (8) 4 C. J., p. 781, n. 29 New.

APPEAL from a judgment of the Superior Court of Plumas County and from an order denying a new trial.   J. O. Moncur, Judge.   Affirmed.

The facts are stated in the opinion of the court.

Brownstone & Goodman and M. C. Kerr for Appellant.

L. H. Hughes for Respondent.

PLUMMER, J.—This is an appeal by the defendant from a judgment awarding the plaintiff the sum of $1,650 damages, for and on account of four causes of action, two for unlawful arrests and two for malicious prosecution.   It appears from the transcript that, on or about the third day of January, 1918, the plaintiff, W. P. Vernon, with others, located a certain placer mining claim named the "Questionnaire" situated in Plumas County, state of California; that in this location notice the claim was described as being situated in range 11 east; in October of the same year, upon having a survey made of the claim, it was discovered that the claim was really situated in range 12.   Thereupon, and on the ninth day of that month, a new location was posted and recorded correctly describing the range in which the claim was situated.   It also appears that from the date of the original location the plaintiff continued in possession of said mining claim, performed annual work thereon, and proceeded to some extent with the development thereof.   This work was continued from time to time by the plaintiff down to the time of the occurrences constituting the gravamen of this action.   Some time between the third day of January, 1918, and the first of October, 1918, the defendant Lumber Company purchased from the United States, through its forestry service, the timber situated on certain lands in

Plumas County. The area on which the timber pur-
chased was situated embraces the mining claim of the ap-
pellant. Nothing was done by the appellant toward re-
moving the timber situated on the plaintiff's mining claim
until early in the spring of 1923, when the defendant began
making preparations to remove said timber, and built a log-
ging road and log landing in a certain ravine below the point
where the plaintiff had theretofore been engaged in mining,
and down which ravine the waters used by him in his mining
operations had flowed and would naturally flow. It does not
appear that the plaintiff knew anything of the construction
of this road or of the logging dam.

Early in the month of May, 1923, the plaintiff returned to
his mining claim and prepared to again work thereon, and,
in doing so, turned water from the source of his supply
through a ditch theretofore constructed by him conveying
water to his diggings. On the 17th, while the plaintiff was
at work, he discovered that water being used by him had
been turned out of this ditch, and upon inquiry plaintiff
was advised by one McDonald, the wood's foreman of the
appellant, that he, McDonald, had turned the water out of
the plaintiff's ditch and away from the plaintiff's diggings.
Upon being advised of this fact the plaintiff on the follow-
ing day, May 18th, called at the office of the appellant and
inquired of I. M. Johnson, the manager of appellant, if the
water used by him in his mining operations would cause
appellant any injury. It appears that Mr. Johnson refused
to discuss the matter with the plaintiff, but threatened to
have the plaintiff arrested and taken to Quincy if he turned
any water into that ravine and also told the plaintiff that he
had "no business up there." Plaintiff returned to his mine
and resumed work thereon, and while so engaged on the mine
on May 19th he was arrested by Roy M. Johnson, an em-
ployee of the appellant, and son of I. M. Johnson. The ar-
rest was made without any warrant having been issued for the
apprehension of the respondent and without any complaint
having been filed against him and while the plaintiff was
engaged in working on the mining premises claimed as his
property. Following this arrest the plaintiff was taken to
Quincy and, as found by the court, imprisoned in the county
jail at Quincy for the period of three hours, during which
time I. M. Johnson consulted an attorney named M. C. Kerr

and the district attorney of Plumas County, and then went to the office of a justice of the peace at Quincy, swore to a complaint against the plaintiff, secured the issuance of a warrant of arrest and thereafter the plaintiff was arrested under said warrant; the plaintiff, being allowed to go on his own recognizance, returned to his mining claim and again resumed operations thereon, and on the morning of May 21, 1923, he was again arrested by the said Roy M. Johnson without any warrant, taken to the town of Quincy, and detained at the county jail for the period of two hours, during which time the said I. M. Johnson swore to a second complaint, procured the issuance of a second warrant, and the plaintiff was subsequently rearrested under said second warrant. Thus the plaintiff was arrested twice without any warrants and twice after warrants had been issued. It appears also that the plaintiff was detained and held in the custody of the said Roy M. Johnson several hours other and in addition to the time he was confined in the county jail at Quincy. A trial being had upon the first complaint, the plaintiff was acquitted and the second complaint was thereupon dismissed. Thereafter the plaintiff began this action, founded upon the alleged unlawful imprisonment on May 19, 1923, the alleged unlawful imprisonment on May 21, 1923, the alleged malicious prosecution of plaintiff, by reason of the first complaint sworn to by I. M. Johnson and the alleged malicious prosecution of plaintiff by reason of the second complaint sworn to by the said I. M. Johnson. Two other grounds were alleged which need not here be considered, as they are in nowise involved in this case. It may be stated that the transcript shows that the arrests made without warrants were made upon the direction and procurement of I. M. Johnson, the manager of the defendant and appellant in this case. The charge of false imprisonment embraced in the plaintiff's complaint rests upon his unlawful detention prior to the issuance of any warrant for his arrest.

Section 849 of the Penal Code reads: "When an arrest is made without a warrant by a peace-officer or private person, the person arrested must, without unnecessary delay, be taken before the nearest or most accessible magistrate in the county in which the arrest is made, and an information, stating the charge against the person, must be laid before such magistrate." Section 145 of the same code is as fol-

lows: "Every public officer or other person, having arrested any person upon a criminal charge, who willfully delays to take such person before a magistrate having jurisdiction, to take his examination, is guilty of a misdemeanor."

[1] The facts exhibited by the transcript in this case, which we have set forth, show that there was no effort made by the agents of of the defendant to comply with the provisions of section 849, *supra.* Instead of taking plaintiff before the magistrate, he was placed in jail while the acting parties themselves went and consulted two attorneys and then repaired to the magistrate's office. No reason is given whatever why the plaintiff was not taken before the magistrate at the time the persons effecting his arrest went to the office of the magistrate. That the magistrate was accessible clearly appears from the fact that the agents of the defendant went to his office and swore out a warrant. These facts appear in relation to both arrests, they show clearly that there was no necessity for imprisoning the plaintiff either upon the first or the second arrest; that there was no warrant for confining him in the jail and that it was their duty and within their power to take the plaintiff to the office of the magistrate in Quincy, without first placing him in the county jail. We do not need to decide whether the agents of the appellant brought themselves within the provisions of section 145 of the Penal Code further than to state that there is nothing in the record establishing any necessity for the action of the agents of the defendant, in taking the plaintiff to the county jail instead of taking him with themselves at the time they repaired to the presence of the magistrate. Under the circumstances we do not very well see how the trial court could have come to any other conclusion than that there was an unnecessary delay in taking the plaintiff before the committing magistrate, and, therefore, that his imprisonment, as found by the trial court, was wholly unwarranted. That the agents of the appellant were ignorant of the provisions of section 849 of the Penal Code does not lessen their duty in such cases, nor obviate the results of the clear showing in the transcript that the plaintiff was unnecessarily confined in the county jail while deliberations were being had as to the further proceedings to be taken. In *Keefe* v. *Hart et al.,* 213 Mass. 476 [Ann. Cas. 1914A, 716, 100 N. E. 558], the supreme court, considering similar

questions, said: "It cannot be said as matter of law that their delay for an hour and a half, by officers arresting without warrant, in taking the prisoner before a magistrate, was reasonable, since such delay might have been beyond the time of adjournment of the magistrate's court, and involved a further delay; the question becoming one of law only when the facts are agreed"; and the same court in its opinion further said: "The defendants had no right to detain the plaintiff to enable them to make a further investigation of the charge against him. It was their duty to bring him before the court as soon as reasonably could be done."

The defendant's agents in this case did exactly what the supreme court of Massachusetts has said is unlawful to be done under such circumstances. The plaintiff was not only imprisoned while the agents of the appellant were not only not investigating the charge against the plaintiff, but were making efforts to have some charge placed against the plaintiff and his arrest thereafter effected under a warrant charging him with an offense. In *Jackson* v. *Miller,* 84 N. J. L. 189 [86 Atl. 50], it was held that the detention in a public place for even an hour of a person arrested without a warrant, by a deputy fish and game warden, upon what seemed to be probable or good cause to believe that the law had been violated, constituted false imprisonment. **[2]** The rule is well established that a prisoner is entitled to a hearing within a reasonable time after his arrest, and that a delay for an unreasonable time in bringing him before the magistrate for examination constitutes false imprisonment. (*Gomez* v. *Scanlon,* 155 Cal. 528 [102 Pac. 12]; *Clark* v. *Tilton,* 74 N. H. 330 [68 Atl. 335]; *Piedmont Hotel Co.* v. *Henderson,* 9 Ga. App. 672 [72 S. E. 51]; *Jackson* v. *Miller,* 84 N. J. L. 189 [86 Atl. 50]; *Schoette* v. *Drake,* 139 Wis. 18 [120 N. W. 393].) The foregoing clearly establishes that the two charges of false imprisonment preferred by the plaintiff against the defendant in his action for damages are abundantly supported by the law and testimony and that no other conclusion could have been reached by the trial court.

**[3]** Are the two causes of malicious prosecution supported by the record? Was there probable cause, and did the defendant's agents act upon the advice of counsel in such manner and degree as relieves the defendant from responsibility?

By way of special defense, the defendant alleged in its answer that it consulted M. C. Kerr, an attorney at law of good standing, having offices in Quincy, Plumas County, state of California, and, also, the district attorney of Plumas County, and stated to said persons all the facts of the case, and was thereupon advised by the said Kerr and the district attorney that a prosecution would lie against the plaintiff, and that the defendant acted honestly and in good faith upon that advice and thereupon instituted the prosecutions referred to in plaintiff's complaint. The finding of the trial court was that the agents of the defendant did not act either honestly or in good faith upon the advice of counsel and that the defendant's agents did not state to said persons all the facts in the case and the defendant's agents were not advised that a criminal prosecution would lie. The court also found that there was not probable cause for the prosecutions herein referred to. In *Johnson* v. *Southern Pac. Co.,* 157 Cal. 333 [107 Pac. 611], the court held: ''When there is no conflict in the evidence, the question whether or not the evidence introduced for the plaintiff shows probable cause is always for the court to decide; and it is error in such case, where there is probable cause, to submit any question to the jury.'' In 16 California Jurisprudence, 751, section 18, the law applicable to the questions which we are considering is thus set forth: ''The good faith, the belief and the knowledge of defendant are necessarily questions of fact to be determined by a jury, unless established by uncontroverted testimony or admitted by the defendant or his counsel. So whether or not the defendant acted *bona fide* upon counsel's advice is a question of fact for the jury. The question whether the defendant had or had not probable cause for instituting the proceeding is a matter of law to be determined from the facts established in the case. If the facts are admitted, the question is solely one of law, for the court. If the facts are disputed and the evidence is conflicting, the question of what the facts are is one of fact, and the question as to whether or not the facts found establish want of probable cause is one of law for the court. If, however, there is affirmative evidence of the actual belief of the defendant sufficient to justify a conclusion that he did not in fact believe in the truth of the charge, the question of probable

cause to that extent involves a question of fact to be submitted to the jury.'' In *Dawson* v. *Schloss,* 93 Cal. 194, quoting from page 202 [29 Pac. 31, 32], we find the questions here presented treated in this manner: ''Appellant contends that he was advised by counsel that there was probable cause for believing respondent guilty of perjury; that he in good faith acted upon such advice; and, therefore, that he is not responsible, even though there may have been no probable cause. In order to avail himself of this defense, it devolved upon the defendant to prove that before receiving the advice he had fairly and fully communicated to his counsel, or at least that his counsel knew, all the facts within defendant's knowledge tending to prove or to disprove probable cause for the prosecution. . . . Did the defendant make the required communication to his own counsel? And did he believe the plaintiff guilty, at the time he made his affidavit to that effect? These questions having been properly submitted to the jury with proper instructions by the court, the verdict necessarily implies that the jury answered one of them, at least, in the negative.'' The court then stated that there was evidence tending to prove that the defendant did not fully state to his counsel all the facts within his knowledge, etc.

The asserted superior title to the premises on which the plaintiff was working appears to have been really the basis of the prosecutions instituted against him and this superior claim appears to be based to a considerable extent upon the error which occurred in the plaintiff's first location notice. We do not here assume to consider any question of title other than as the same bears upon the finding of the trial court that there was no probable cause for the action taken by the defendant. The transcript shows that the plaintiff did the necessary annual assessment work upon his mining claim and that he had worked upon his claim every year after its location up to the time of his arrest. The testimony also shows that the defendant's manager had seen the plaintiff working his mining claim. The testimony in this particular is as follows: ''Q. You knew that he (plaintiff) had been mining in that vicinity before? A. Yes, sir. I had seen him working there. Q. And in doing that you knew that he was mining on his own ground? A. I knew he was mining up there. Q. And you knew that he mined there

with water, and that that water would come down this particular creek where you built your logway? A. Yes, sir. Q. And you knew that before you built this road and log landing, didn't you? A. Yes.'' The testimony of the witness Orr, of the United States Forestry Service, is illustrative: ''A. I told Mr. Vernon that I would like to have him show me where his claim was, so that if the claim was owned by him or he had a title to it, we could keep off of it. Mr. Vernon and Mr. Johnson and I walked up and found this notice on a tree. . . . Q. You refer to the notice dated October 9th, 1918? A. Yes, sir. Q. And where did you see that notice at that time? A. He did. Q. And what did he say about it, that is, Mr. Vernon? A. He said that was where he had filed the mining location. Q. What did you say to him? A. I asked him what date it was. Q. And what did he say? A. He said, 'I don't know,' but he says, 'We will look on the claim.' I says, 'All right, we will look,' and it said October 9th, 1918. Q. And what did you say to him? A. I said, 'Mr. Vernon, if that is the case your timber (claim?) has been taken up since the timber was sold to Mr. Johnson and under that procedure it would be necessary for us to go ahead and cut the timber to see that Mr. Johnson removed it.' . . . Q. And what did he say in reply to that? A. He says, 'I think there is some mistake on this notice and let us check it,' and we checked the description and found it was wrong and I says, 'I will go into the recorder's office and see if your filing date is right.' ''

The question of title appears to have been taken up by the defendant with the Forestry Service of the United States and the following telegram received:

''San Francisco, Calif., May 18, 1923.
''Forest Supervisor
    ''Quincy California
''Notify owner Questionnaire Claim any interference with timber sale operations will result in legal proceedings Federal Court   Recent decision Circuit Court Appeals sustains our position.''

This telegram, or a correct copy of it, appears to have been exhibited to the plaintiff by some one of the defendant's agents. The witness then testified: ''A. Mr. Vernon was, at

the time I called on him, eating his dinner. He came out and I handed him a copy of a telegram from the forestry and let him read it and in the presence of Mr. Erickson and myself he put on his glasses and read it. Q. And then did he hand it back to you? A. He did. Q. What did he say? A. 'Well, what about it?' was his exact words, and I wanted to find out whether he was going to turn the water in or not, which I asked him. Q. What did he say? A. He said he was.'' The transcript shows more testimony along the same line, but the whole purport of it exhibits simply a dispute as to who was the owner of the premises, and this apparently was all founded upon the errors in the plaintiff's notices of location and as to what rights, if any, the plaintiff acquired thereunder, also the alleged superior right of the defendant to the unobstructed use of the premises in order to remove the timber standing thereon appears as an actuating motive in all the proceedings.

As to whether the defendant acted upon the advice of counsel, what advice was received, and what was stated to counsel, the appellant relies upon the following: Q. ''And did you tell him what the Forestry Service had done about sending the telegram up? A. Yes. Q. And did you tell everything that you knew about this particular incident? A. Yes. Q. That caused you to complain against Mr. Vernon? A. Yes, sir. Q. And what did Mr. Kerr tell you? A. He suggested just exactly what I done. Q. And what was that, what did he suggest? A. I file a complaint against him for interfering with our operations. Q. Now, did you act honestly and in good faith upon the advice of Mr. Kerr? A. Absolutely, yes, sir. Q. Were you actuated by malice, hatred, or ill feeling, in swearing out the complaint against Mr. Vernon? A. Never had a word with him in my life and no malice against him whatever. Q. And when you acted upon the advice of Mr. Kerr and swore to this complaint were you actuated by an honest belief that he was guilty of the offense that you charged him with? A. Absolutely. Q. When you instituted the criminal prosecution against Mr. Vernon upon the advice of Mr. Kerr, did you honestly believe in good faith that he was guilty of the offense as charged against him? A. Absolutely, yes, sir. Q. Now, Mr. Johnson, besides con-

sulting Mr. Kerr before you swore to this complaint on May 19th, did you also consult the district attorney of this county? A. I did. Q. Mr. S. C. Young? A. Yes. Q. And did you state to Mr. Young all of the facts that you have stated that you stated to Mr. Kerr? A. I did. Q. Did Mr. Kerr accompany you to Mr. Young, the district attorney's office? A. He did. Q. And was he there during the time you stated the facts to him? A. Part of the time. Q. Did the district attorney—what did the district attorney tell you as to whether or not a prosecution would lie against the defendant—against Mr. Vernon? A. If it would what? Q. What did the district attorney tell you as to whether or not a complaint would be good against the defendant Vernon, against the defendant Vernon in that proceeding? A. He thought it was all right. Q. And who prepared the complaint? A. The district attorney, Mr. Young. Q. Now, did you state to the district attorney and to Mr. Kerr all of the facts within your knowledge in respect to this offense? A. Absolutely. Q. With which you had charged Mr. Vernon? A. Yes. Q. Mr. Kerr, did Mr. Johnson, Mr. I. M. Johnson consult you on the 19th day of May, 1923, in respect— A. (Interrupting.) As to the particular date— Q. Let me finish my question— in respect to whether or not he could swear to a complaint against Mr. Vernon? A. The date of the first complaint, that the first complaint was filed, Mr. Johnson, according to my best recollection of the thing, was, he called me on the phone in the morning before he came down and we had some conversation regarding Mr. Vernon turning in some water that was damaging the roadway, etc., and something was said about an injunction being prepared or in the course of preparation by the Forest Department. However, I think that I told Mr. Vernon over the phone that I would see him when he came down and upon his arrival in Quincy he either came to the office or called me up from the Forest office. I am not sure as to that. At any rate, we were together at the office of the Forest Supervisor of the Plumas National Forest, at the office in Quincy, and in conversation with Mr. Rogers there the matter of this timber sale and the rights under it were discussed and I don't know whether Mr. Orr was there or not, but at any rate,

there was something came up about there apparently had
been some discussion as to this before and Mr. Rogers gave
me a letter that was written by Mr. Dechant and giving
the citations of the United States and Federal citations
regarding the rights of a timber purchaser to move timber.
Well, I think that was one of the things that I went—
that the consultation at the Forest Office was as to the
fact as to whether or not a timber sale had been made.
That was substantiated. Then the matter of destruction of
property, and Mr. Johnson informed me that the water
had been turned in and was destroying the property and
the road, the road of the Plumas Lumber Company. I
went with Mr. Johnson to the District Attorney's office and
was there a portion of the time while Mr. Johnson was
giving him the facts concerning the matter, but I wasn't
there all the time. I wasn't there the full time and per-
sonally don't know who prepared the complaint, but the
complaint was afterwards prepared, but from the facts as
given to me by Mr. Johnson and looking up the law, I
did advise him that he had an action against Mr. Vernon
for the injury, or attempted destruction of his property,
not of Mr. Johnson's, but of the Plumas Lumber Company,
I believe, or Mr. Johnson, under his timber sale.''

On cross-examination, after testifying that he had threat-
ened to arrest the plaintiff, the witness I. M. Johnson fur-
ther testified: ''Q. You knew that he had been mining in
that vicinity before? A. Yes, sir. I had seen him work-
ing there. Q. In that immediate vicinity, when you built
your road this year, you knew that he had been working
in that canyon for years? A. Yes, sir. I did. Q. What
did you mean, Mr. Johnson, when you told him if he turned
water into that canyon that you would take him to Quincy?
A. Simply that I would arrest him for interfering. Q.
Now, you had your mind made up from the time you had
this visit from ' Mr. Vernon in your office, prior to any
arrest at all, that the minute that he turned any water
through to mine with, you were going to have him pinched,
weren't you? A. Yes, sir. . . . Q. What was your motive
and reason for instituting both of these criminal prosecu-
tions against Mr. Vernon? A. For protection to our busi-
ness. We either had to close or stop Mr. Vernon, one or

the other.   Q. Now, then, you testified on direct examination, I think, that the reason you had Mr. Vernon arrested was because you wanted it as a protection to your business, is that right?   A. Yes, sir."

There are other portions of the testimony referred to by the counsel for the respective parties, but we think the foregoing is sufficient to justify the trial court in reaching its conclusion in this case, and clearly sets forth that every element of defense tendered in this cause rested upon disputed facts, and, therefore, that the conclusion of the trial court upon such facts is conclusive here.   There is sufficient testimony in the transcript, as set forth, to support the findings of the trial court, even though there is testimony from which the court might have come to a different conclusion.   The transcript further shows that the witness Johnson was unable at the time of the trial to detail what facts he had stated either to Mr. Kerr or the district attorney, and the only evidence in relation thereto is such as hereinbefore set forth, which consisted simply of conclusions by the witness Johnson that he had stated all the facts and had honestly stated them and had an honest belief, etc.   Whether such facts were all stated or honestly stated, or whether the manager of the plaintiff had such honest belief were matters for the trial court to determine upon conflicting testimony, and being determined adversely to the appellant, cannot be otherwise determined here.   The evidence here set forth is that most favorable to the appellant, and yet we think it clearly sufficient to justify the court in concluding that there was no probable cause. When thoroughly considered, we think the trial court had the right to conclude that the appellant was advised simply as to its civil rights and that the criminality of any acts on the part of the plaintiff were not controlling factors. As stated by the manager of the defendant, the arrest was "for protection of our business."   To state it another way, it was the substitution of a criminal prosecution instead of a civil action because that method of procedure would more quickly stop the plaintiff's mining operations.   All these matters which the trial court sitting without a jury was entitled to take into consideration we think answers all that the law demands in actions such as the one at bar.   In

*Burke* v. *Watts,* 188 Cal. 118, quoting from page 123 [204 Pac. 578, 580], it is stated: "The law on the subject of malicious prosecution is well established. In *McKenna* v. *Heinlen,* 128 Cal. 97 [60 Pac. 668], an action to recover for malicious prosecution, the court said: 'It is well settled that before a plaintiff can recover in an action for malicious prosecution he must establish concurrently that the defendant proceeded in the action brought by him with malice and without probable cause. The question of malice is one for the jury exclusively, but the court must determine, as matter of law, whether the facts and circumstances as they appear, or are found to exist, constituted probable cause. . . . While it is true that malice may be inferred from want of probable cause, the latter can never be implied from malice.' In *Potter* v. *Seale,* 8 Cal. 217, the court defined probable cause as 'a suspicion founded upon circumstances sufficiently strong to warrant a reasonable man in the belief that the charge is true.' In *Harkrader* v. *Moore,* 44 Cal. 144, also an action for malicious prosecution, it was declared: 'The defense must be that he did believe and had reasonable grounds to believe at the time that the accusation he made was well founded.' "

All these necessary facts, as herein stated, being found adversely to the appellant upon conflicting testimony, establish the defendant's liability upon the two causes of action charging malicious prosecutions.

[4] During the course of the trial the appellant sought to introduce evidence that the Forestry Service of the United States had advised the defendant that the rights of the defendant in the premises predominated; that this information was founded upon certain decisions of the federal courts of the United States to the effect that the mere location of a mining claim gives to the person locating the same no title to the timber thereon, etc. This testimony was excluded and the ruling of the court is assigned as error. The reasons given by the court in excluding the testimony are sufficient and need no elaboration: "I will sustain the objection. This ruling is based upon the fact that any advice concerning the civil or equitable rights of the parties . . . would have no bearing whatever in a criminal action."

[5] It is further alleged that there was a misjoinder of actions. This objection, however, was not taken in the

manner provided by the Code of Civil Procedure and hence is not available here. (Sec. 434, Code Civ. Proc.; *Fellows* v. *City of Los Angeles,* 151 Cal. 60 [90 Pac. 137]; *Ransch* v. *Arp.* 39 Cal. App. 580 [179 Pac. 694].)

[6] We do not find any merit in the contention of the appellant that double awards have been made herein. As we have shown, the allegation of false imprisonment contained in the plaintiff's complaint and in the testimony set forth in the transcript show two distinct arrests without warrants and imprisonment following each of said arrests and thereafter two other distinct arrests upon the issuing of warrants. The damages claimed, found, and allowed by the court were for the imprisonments following the arrests made without warrants and therefore had nothing to do with the causes of action culminating in the charges of malicious prosecutions. The prosecutions were based upon complaints and warrants and were separate and distinct from the previous false imprisonments; that they followed each other in successive events does not in anywise merge the wrongs inflicted or take away from the plaintiff the right to recover damages for both of the periods when he was falsely incarcerated, nor to recover damages for the malicious prosecutions which were thereafter instituted by the subsequent filing of complaints, issuance of warrants, and following arrests.

[7] It is finally urged that the awards allowed by the trial court are excessive. Had the plaintiff been found guilty of the charges alleged against him, he might have been incarcerated in the county jail for a period not exceeding six months or by a fine not exceeding the sum of $500 or both. We think the trial court was justified in taking into consideration such matters in measuring the culpability of the intent of the defendant's agents and what injuries they were attempting to inflict upon the plaintiff.

In *Scott* v. *Times-Mirror Co.,* 181 Cal. 366 [12 A. L. R. 1007, 184 Pac. 681], the court set forth the matters that may be considered in fixing damages and then said: "In fixing damages in this class of cases, which is left to the discretion of the jury, and when the verdict has been approved by the trial court, this court is not authorized

to grant a new trial upon the ground of excessive damages, except in a case where it is plain that the verdict was not the result of the fair and honest judgment of the jury,'' citing a number of cases. ''In the latter case it was said: 'The court below had the power to, and no doubt did, carefully weigh and consider the evidence for the purpose of determining whether or not the verdict was the correct conclusion from all the testimony in the case. It had the power to set aside the verdict, even though the evidence was not conflicting, if convinced that it was unjust, or not in accord with the weight of the evidence. Here we have no such power. The presumptions are all in favor of the correctness of the verdict. To this presumption is added the sanction of the court below in denying the motion for a new trial. . . . In the matter of punitive damages it is clear from the authorities that juries have a wider discretion in this regard than they have in the matter of compensatory damages.' '' The exemplary damages in the instant case amount to the sum of $150,—$100 in one case and $50 in the other, the remainder of the awards consisting of punitive damages awarded by the court. **[8]** In the instant case the trial was had before the court sitting without a jury and, unless there is some showing to that effect, we are not at liberty to assume that the trial court acted either from passion or prejudice or from any improper motives whatever.

The judgment and order of the trial court are hereby affirmed.

Finch, P. J., and Hart, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on March 30, 1925.