[Crim. No. 17386. In Bank. July 30, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
LLOYD ANTHONY HAYDEL et al., Defendants and Appellants.

## COUNSEL

Harold D. Winingar for Defendants and Appellants.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, Charles P. Just, Roger E. Venturi, W. Scott Thorpe and David M. Blackman, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BURKE, J.**—A jury found Lloyd and Dorothy Haydel guilty of grand theft. The court suspended imposition of the judgments and placed each defendant on probation conditioned on a jail term. They appeal, contending primarily that the court erred in admitting (a) four assertedly coerced written statements obtained from Haydel by the security officers of a store and (b) evidence procured by those officers at the Haydel home as a result of one of those statements. We have concluded that the court committed prejudicial error in admitting three of Haydel's statements and the evidence obtained at the Haydel home and that the orders granting probation must therefore be reversed.

Lloyd Haydel was employed as a stock supervisor in a Sacramento department store. Michael Kinney, a security officer employed by the store

who was investigating the disappearance of merchandise, suspected Haydel. On October 16, 1971, Kinney began a surveillance of the store's "will call" loading dock, where customers pick up purchases by automobile. About 12:20 p.m. that day Kinney saw Haydel's wife, Dorothy, drive up to the "will call" entrance. The Haydels' 3-year-old son was with her.

Kinney testified: Haydel came out of the store and put a box in the car trunk. After Haydel got a second box, Kinney approached and asked to examine the "will call" sheet for it. Haydel threw the box in the trunk and slammed the trunk shut. When Kinney asked to see the sales slips, Haydel stuttered and motioned to his wife to leave. Kinney stated that she was detained and that he knew "what was going on." Haydel said, "all right, leave her alone," and opened the trunk and threw the two boxes onto the loading dock. Kinney's examination of the two boxes disclosed merchandise belonging to the store, worth over $200.

An inventory of the contents of the boxes was made shortly thereafter. The boxes contained, inter alia, eight pairs of shoes of a size Haydel admitted was his including a pair of a type he specially ordered, several pairs of shoes of a size his wife sometimes wore, some children's shoes, underclothing of his size, and two train sets.

About 12:30 p.m. Kinney took the Haydels and their child inside the store. After putting Haydel in one office, Kinney took Mrs. Haydel and the child to the office of Mrs. Carter, the personnel manager. There he told Mrs. Haydel she was under arrest, and he left instructions that she was not to be released. Food was offered to her and the child. She testified, and the store personnel denied, that she was refused permission to call someone to pick up the child. She also testified that the child had a "chronic tonsillitis condition." Mrs. Carter testified that the child did not appear sick and that Mrs. Haydel never told her the child was sick.

After leaving Mrs. Carter's office Kinney returned to the office where he had left Haydel. According to Kinney, at the outset of the interview Haydel orally admitted the theft of the items in the car. Around 1 p.m. a second security officer employed by the store, Gary Pennock, joined Kinney and Haydel. Subsequently Kinney had typed up a confession Haydel had made orally, and around 2 p.m. Haydel signed the confession and initialed it in several places. In the confession he admitted that on October 16, 1971, he placed in boxes store merchandise, later valued at $432.38, and then put the boxes in the trunk of his wife's car and that he intended to take the merchandise without paying for it, but he asserted his wife's innocence.

About 2:45 p.m. Haydel signed a second statement, which read, "I . . . authorize [the store] or its agents to enter my home . . . to obtain merchandise I have taken without payment from [the store] providing my wife Dorothy and/or I are present." Subsequently Kinney and Pennock accompanied Haydel to the Haydel home, and there Kinney and Pennock found a large quantity of merchandise that Haydel orally admitted belonged to the store.[1] Around 5:20 p.m. Haydel signed a third statement, which read, ". . . The merchandise I allowed [the store's] . . . agents to remove from my home on . . . October 16, 1971, is not mine. I didn't make any payment for it. [¶] Anything else I recall that belongs to [the store] I will allow [the store] to pick up . . . later . . . ."

About 5:55 p.m., after returning to the store, Haydel signed a fourth statement, in which he admitted "having taken merchandise" from the store "three times." Between 5:45 and 6 p.m. the police were called, and they arrived at the store around 6 p.m. They suggested Mrs. Haydel call someone to pick up the child, and she did so.

Both defendants took the stand in their own behalf. Haydel testified that his wife came to the "will call" area on October 16, after he called her and asked her to pick up some empty boxes to be used for purposes such as grass cuttings. He stated that after she arrived she decided to get lunch first and to pick up the boxes later and that at that point Kinney arrived. Haydel denied having placed any merchandise in the car trunk. Mrs. Haydel similarly testified that no boxes were placed in the car trunk. Haydel also denied having orally admitted to Kinney "taking those items [apparently the items Kinney testified Haydel put in his car]." He further testified that "Somebody planted it [the merchandise in the boxes]" and that he did not have "the slightest idea" why he was "set up."

### Whether Court Erred in Overruling Objection to Haydel's Four Signed Statements on Grounds of Coercion.

█ Defendants contend that the court erred in admitting, over objection on the ground of coercion, Haydel's four signed statements since they were extracted from him by the security officers through promises and trickery and through psychological duress, emanating from the enforced detention of his wife and child. The People argue that there was no state action which would invoke the due process clause of the Fourteenth Amendment of the federal Constitution since the statements were elicited by private persons and that in any event the statements were voluntary.

---

[1] The merchandise included items such as over twenty boxes of stockings, seven pairs of men's new shoes, three boxes of slips, forty women's "PAM" panties, five Fieldcrest blankets, and a cookie jar matching a loss report of the store.

█ The use in a criminal prosecution of involuntary confessions constitutes a denial of due process of law under both the federal and state Constitutions. (*Lego* v. *Twomey*, 404 U.S. 477, 483 [30 L.Ed.2d 618, 623-624, 92 S.Ct. 619]; *Jackson* v. *Denno*, 378 U.S. 368, 385-386 [12 L.Ed.2d 908, 920-921, 84 S.Ct. 1774, 1 A.L.R.3d 1205]; *People* v. *Sanchez*, 70 Cal.2d 562, 571 [75 Cal.Rptr. 642, 451 P.2d 74]; *People* v. *Trout*, 54 Cal.2d 576, 583 [6 Cal.Rptr. 759, 354 P.2d 231, 80 A.L.R. 2d 1418].) **(3)** Involuntary admissions are also inadmissible (*People* v. *Underwood*, 61 Cal.2d 113, 120 [37 Cal.Rptr. 313, 389 P.2d 937]; *People* v. *Atchley*, 53 Cal.2d 160, 169-170 [346 P.2d 764]), and "the due process clause of the Fourteenth Amendment requires exclusion of coerced admissions if they are sufficiently damaging. (*Ashcraft* v. *Tennessee,* 327 U.S. 274 . . . ; but cf. *Stein* v. *New York*, 346 U.S. 156, 162-163, footnote 5 . . . .)"[2] (*People* v. *Atchley, supra*, p. 170.)

█ In *People* v. *Berve*, 51 Cal.2d 286, 293 [332 P.2d 97], wherein the defendant was beaten and threatened with violence by civilians and confessed to the police shortly thereafter, this court in holding the confession inadmissible stated in part, "No valid grounds for distinction are to be found in the fact that the coercion in this case was inflicted by civilians, and not the police. Decisions holding that confessions are inadmissible because they were rendered under conditions of threatened mob violence by civilians against an accused clearly imply such conclusion. [Citations.] The prohibition which bars the use of involuntary confessions is not only designed as a regulation of the conduct of police officers, but also to insure that an accused's right to a fair trial is protected. [Citation.] █ The absence of volition condemns an enforced confession. Due process requires that it be given voluntarily and without promise of immunity or reward." (See also Maguire, *Evidence of Guilt* (1959) p. 109, fn. 2.)

█ The foregoing reasoning in *People* v. *Berve, supra*, 51 Cal.2d 286, 293, likewise appears applicable where the confession is not only coerced by, but also made to, civilians, and cases in a number of jurisdictions have concluded that an involuntary confession, whether made to law enforcement officers or private persons, is inadmissible. (*People* v. *Frank*, 52 Misc.2d 266 [275 N.Y.S.2d 570, 571-572]; *State* v. *Ely*, 237 Ore. 329 [390 P.2d 348, 349]; *Fisher* v. *State* (Tex.Crim.App.) 379 S.W.2d 900, 901 et seq.; see *State* v. *Christopher*, 10 Ariz.App. 169 [457 P.2d 356, 358].) Thus whether or not the security guards here were pri-

---

[2]*Stein* v. *New York, supra*, 346 U.S. 156, 162-163 [97 L.Ed. 1522, 1531-1532, 73 S.Ct. 1077], was overruled on another issue in *Jackson* v. *Denno, supra*, 378 U.S. 368, 391 [12 L.Ed.2d 908, 923-924].

vate persons, the People's argument that there was no state action which would invoke the due process clause cannot be upheld.

We turn next to whether Haydel's four written statements were shown to have been voluntarily made. ■ "Before confessions or admissions may be used against a defendant the prosecution has the burden of showing that they were voluntary and not the result of any form of compulsion or promise of reward, and it is the duty of a reviewing court to examine the *uncontradicted* facts in order to determine *independently* whether the statements were voluntary." (Italics added; *People* v. *Underwood, supra*, 61 Cal.2d 113, 121; in accord, *People* v. *Sanchez, supra*, 70 Cal.2d 562, 571-572.)

■ " 'If an individual's "will was overborne" or if his confession was not "the product of a rational intellect and a free will," his confession is inadmissible because coerced. These standards are applicable whether a confession is the product of physical intimidation or pyschological pressure. . . .' (*Townsend* v. *Sain* . . . 372 U.S. 293, 307 . . . , quoting from *Reck* v. *Pate* . . . 367 U.S. 433, 440 . . . ; and *Blackburn* v. *Alabama* . . . 361 U.S. 199, 208 . . . .) ■ In determining whether the defendant's confession is the product of a rational intellect and a free will, the totality of the circumstances surrounding the confession must be taken into account." (*People* v. *Sanchez, supra*, 70 Cal.2d 562, 572; see also *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 223-227 [36 L.Ed.2d 854, 860-863, 93 S.Ct. 2041].)

■ It does not appear from the uncontradicted evidence that Haydel's first written statement was involuntary. The questioning before that statement was of short duration and Haydel was a mature individual with three years of college. (See *Frazier* v. *Cupp*, 394 U.S. 731, 739 [22 L.Ed.2d 684, 693, 89 S.Ct. 1420].) He had retired as a master sergeant after 23 years in the military and held a supervisory position at the store.

Although Haydel testified that Kinney told him "The only way you're going to get your wife and baby out is if you sign [the first statement]," Kinney denied having made any promises to Haydel, and when asked, "Did you tell him that . . . you'd let his wife off or let the child go home or anything like that?," Kinney replied, "No, I did not." Haydel further testified that Kinney denied him permission to call an attorney and that he was also refused permission to call the police. Kinney and Pennock testified to the contrary. Such conflicting evidence will not be reweighed on appeal. (See *People* v. *Carr*, 8 Cal.3d 287, 296 [104 Cal.

Rptr. 705, 502 P.2d 513]; *People* v. *Kendrick,* 56 Cal.2d 71, 85 [14 Cal.Rptr. 13, 363 P.2d 13].)

Before Haydel signed the first statement his wife had been arrested, but the arrest was made after she and Haydel were caught in the act of taking the store's merchandise without paying for it. This is not a case where officers restrained the defendant's wife without having any grounds for her arrest and released her many hours later as soon as the defendant confessed (see *People* v. *Trout, supra,* 54 Cal.2d 576, 584), nor a case in which a confession was coerced by a threat to arrest a near relative (*People* v. *Shelton,* 151 Cal.App.2d 587, 588 [311 P.2d 859]; see *People* v. *Matlock,* 51 Cal.2d 682, 697 [336 P.2d 505]).

The uncontradicted evidence shows that the first statement was signed about 2 p.m., i.e., about an hour and a half after Haydel's arrest, and that the police were not called until nearly 6 p.m., and it does not appear that Haydel was taken before a magistrate during that period.  **(9)**  Penal Code section 847 provides: "A private person who has arrested another for the commission of a public offense must, *without unnecessary delay,* take the person before a magistrate or deliver him to a peace officer . . . ." (Italics added.) Penal Code section 849 provides: "When an arrest is made without a warrant by a peace officer or a private person, the person arrested, if not otherwise released, shall *without unnecessary delay,* be taken before the . . . most accessible magistrate . . . ." (Italics added.) A delay of even a few hours may be unnecessary. (See *Dragna* v. *White,* 45 Cal.2d 469, 472 [289 P.2d 428]; *Vernon* v. *Plumas Lumber Co.,* 71 Cal.App. 112, 115-118 [234 P. 869].)

█ Even if the initial one and a half hour delay was unnecessary and the detention therefore illegal, this would not ipso facto render Haydel's first written statement involuntary but merely would be a circumstance to be considered in determining the issue of voluntariness. (*In re Walker,* 10 Cal.3d 764, 779 [112 Cal.Rptr. 177, 518 P.2d 1129]; *People* v. *Kendrick, supra,* 56 Cal.2d 71, 85; *People* v. *Bashor,* 48 Cal.2d 763, 765 [312 P.2d 255]; *Rogers* v. *Superior Court,* 46 Cal.2d 3, 10 [291 P.2d 929]; see Witkin, Cal. Evidence (2d ed. 1966) pp. 454-455.) We conclude that the trial court did not err in overruling the objection on the ground of coercion to Haydel's first written statement.

█ With respect to the second statement, i.e., the "consent to search," Haydel testified that Kinney told him his wife and child could go if he would sign that statement and that Pennock also kept telling him if he

wanted his wife and son out to sign the "statements." Kinney and Pennock testified to the contrary, and we will not reweigh that conflict (see *People* v. *Carr, supra,* 8 Cal.3d 287, 296; *People* v. *Kendrick, supra,* 56 Cal.2d 71, 85.) However, as we shall see, it appears from uncontradicted evidence that the "consent to search" was involuntary.

It appears without dispute that before the "consent to search" was signed Haydel requested that his wife and son be allowed to accompany them to the house for the search, that it was not until after Haydel signed that document he realized his request would not be granted,[3] and that during the afternoon Haydel asked several times when his wife and child would be released.[4]

It is thus apparent that Haydel was concerned about his wife and child and anxious to have their detention terminated. The detention of Mrs. Haydel, as well as that of Haydel, was illegal when he signed the "consent to search" (see Pen. Code, §§ 847, 849), as was conceded by the Attorney General at oral argument. As heretofore appears it was about 2:45 p.m. when Haydel signed the "consent to search," i.e., about 2 hours and 15 minutes after his arrest. No reason was shown why the police could not have been called by that time. It was only after Haydel had acceded to the security officers' requests that he sign the first three statements (and perhaps the fourth statement) that the police were finally called.

Even though the security officers had obtained the first signed confession from Haydel they persisted in their efforts to secure from him still another signature on another statement and they continued to keep the Haydels in separate rooms. It was not until after Haydel signed the "consent to search" that he was permitted to talk to his wife again. As heretofore appears, about 45 minutes elapsed between the time Haydel signed the first statement and the time he signed the second statement, and the psycho-

---

[3]Although when asked, "After Mr. Haydel—or just prior to his signing [the "consent to search"], he told you that he wanted his wife to go home with him, did he not?," Kinney replied, "He had said he wanted it, and I said that *it would be impossible,*" (italics added), the italicized words evidently did not make Haydel realize the fact that his wife and child were not going to accompany the officers and Haydel to the house in view of Kinney's express testimony that Haydel first realized the foregoing fact *after* he signed the "consent to search."

[4]Although Pennock testified that he recalled no mention of Haydel's wife or child except on one occasion when Haydel asked where his wife was, in view of Kinney's testimony that during the afternoon Haydel asked several times when his wife and child would be released, it is apparent that Pennock merely did not recall what had occurred or was temporarily absent when Haydel made the inquiries.

logical pressure on him to cooperate in the hope of freeing his wife and child undoubtedly increased with the passage of time.[5]

The uncontradicted portions of the record thus disclose that the "consent to search" was obtained in "an atmosphere of substantial coercion" (see *Haynes* v. *Washington,* 373 U.S. 503, 513 [10 L.Ed.2d 513, 520, 83 S.Ct. 1336]), created by the actions of the security officers. We are satisfied that the "consent to search" was the product of psychological coercion and involuntary.

The third and fourth statements in our opinion were likewise the product of psychological coercion and involuntary. The court thus erred in overruling the objection to Haydel's second, third, and fourth statements.

### Whether Court Erred in Overruling Objection to Evidence Obtained at the Haydel Home.

At the trial defense counsel moved to suppress "any evidence which was acquired as a result of that alleged consent to search, which in fact was not voluntary" and directed the court's attention to the evidence seized at the Haydel home. The court denied the motion, and defendants argue on appeal that the court thereby erred. The People urge that the court's ruling was proper because (1) the store's security officers were not subject to the commands of the Fourth Amendment and (2) the "consent to search" was voluntary. As we have seen, the People's second argument lacks merit. We need not consider the People's first argument, since, as we shall see, a rule not based on the Fourth Amendment barred the admission of the evidence.

Evidence that is the "fruit" of an involuntary confession is inadmissible. (*People* v. *Ditson,* 57 Cal.2d 415, 439 [20 Cal.Rptr. 165, 369 P.2d 714]; cf. *Harrison* v. *United States,* 392 U.S. 219, 221 et seq. [20 L.Ed.2d 1047, 1050 et seq., 88 S.Ct. 2008]; *People* v. *Schader,* 71 Cal.2d 761, 778-779 [80 Cal.Rptr. 1, 457 P.2d 841].)[6] Here it appears that the evidence ob-

---

[5]Although "The fact that a defendant believes or hopes his confession may result in the exoneration of others does not render it involuntary as a matter of law" (e.g. *People* v. *Kendrick, supra,* 56 Cal.2d 71, 86; *People* v. *Gonsalves,* 275 Cal.App.2d 724, 729 [80 Cal.Rptr. 340]; *People* v. *Boggs,* 255 Cal.App.2d 693, 700 [63 Cal. Rptr. 430] [cert. den., 393 U.S. 871 [21 L.Ed.2d 140, 89 S.Ct. 160]]), here there were other facts such as that the detention of the wife had become illegal and the child was with her.

[6]*Ditson* reasoned that "if it offends 'the community's sense of fair play and decency' to convict a defendant by evidence extorted from him in the form of an involuntary confession, that sense of fair play and decency is no less offended when a defendant

tained at the Haydel home was the product of the second statement, which was involuntarily made. Furthermore, no claim is made, nor does it appear, that the evidence obtained at the home would have been otherwise discovered from information already in the possession of the officers or independently acquired (*People* v. *Ditson, supra,* pp. 443-444; cf. *People* v. *Schader, supra,* p. 779; see *Lockridge* v. *Superior Court,* 3 Cal.3d 166, 170 [89 Cal.Rptr. 731, 474 P.2d 683]), or that the connection between the illegal statement and the evidence seized at the home had " 'become so attenuated as to dissipate the taint.' (*Wong Sun* v. *United States* . . . 371 U.S. 471, 487 . . . .)" (See *People* v. *Schader, supra,* p. 779.) Accordingly, the court erred in admitting the evidence obtained at the home.

### *Whether the Erroneous Admission of Haydel's Second, Third, and Fourth Written Statements and the Evidence Obtained at the Haydel Home Requires Reversal.*

█ Even if Haydel's second, third, and fourth written statements constitute admissions rather than confessions and the prejudicial per se rule does not apply (see *Chapman* v. *California,* 386 U.S. 18, 23 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *People* v. *Powell,* 67 Cal.2d 32, 51-52 [59 Cal.Rptr. 817, 429 P.2d 137]), it is clear that the error in admitting those statements and the evidence obtained at the Haydel home contributed to the convictions and requires reversal of the orders granting probation. (*Chapman* v. *California, supra,* pp. 21-24 [17 L.Ed.2d pp. 708-711]; *People* v. *Watson,* 46 Cal.2d 818, 835-837 [299 P.2d 243]; *People* v. *Bradley,* 1 Cal.3d 80, 89 [81 Cal.Rptr. 457, 460 P.2d 129].)

To begin with that evidence was a prominent part of the prosecution's case, and the introduction of that evidence occupied a substantial portion of the trial. In addition the inadmissible statements contain admissions regarding thefts not mentioned in the properly admitted confession, and the large amount of merchandise retrieved from the Haydel home was not only incriminating to Haydel but also could have been viewed by the jury as giving rise to an inference that Mrs. Haydel must have been aware her husband was stealing merchandise from the store, a matter relevant to her intent. Furthermore the properly admitted evidence of the Haydels' guilt is not so overwhelming that we can say the error in admitting the evidence in question was harmless. Although the properly admitted evidence against Haydel included, among other things, his first written statement, which was

is convicted by real evidence which the police have discovered *essentially by virtue of having extorted such a confession.* If the one amounts to a denial of a fair trial and due process of law, so must the other." (Italics in original.)

a confession, his version of the circumstances surrounding that statement could have been viewed by the jury as affecting the weight of that evidence.

### Other Claims of Error.

Defendants also contend that as to Mrs. Haydel the court erred in refusing to give a requested instruction informing the jury, inter alia, that evidence of an extrajudicial statement by a defendant after his arrest must not be considered against the other defendant. Should the Haydels be retried together and the defense again request such a limiting instruction, it should be given. (See Evid. Code, §§ 355, 1200-1341.)[7]

The orders granting probation are reversed.

Wright, C. J., McComb, J., Tobriner, J., Mosk, J., Sullivan, J., and Clark, J., concurred.

---

[7]There is no merit to a contention by defendants that the court erred in failing to instruct the jury to determine for itself the voluntariness of Haydel's statements and, if found involuntary, to disregard them. (See Evid. Code, §§ 400, 402, subd. (b), 405; *People* v. *Culver,* 10 Cal.3d 542, 547-548, fn. 8 [111 Cal.Rptr. 183, 516 P.2d 887]; *People* v. *Burton,* 6 Cal.3d 375, 389-390 [99 Cal.Rptr. 1, 491 P.2d 793].)