## BARRETT v. UNITED STATES.
### No. 5718.

Circuit Court of Appeals, Seventh Circuit. March 17, 1936.

Fred C. Gause and W. H. Thompson, both of Indianapolis, Ind., for appellant.

Val Nolan, U. S. Atty., and B. Howard Caughran and Paul A. Pfister, Asst. U. S. Attys., all of Indianapolis, Ind.

Before EVANS and SPARKS, Circuit Judges, and LINDLEY, District Judge.

SPARKS, Circuit Judge.

The appellant, George W. Barrett, was charged by a grand jury indictment with having murdered Nelson B. Klein, a special agent of the Division of Investigation of the Department of Justice, on August 16, 1935, at College Corner, Union County, Indiana. Appellant interposed a plea of not guilty. The jury found him guilty of murder in the first degree without qualification of the verdict. The judgment followed the verdict and he was ordered executed in the Marion County jail at Indianapolis on March 24, 1936.

As defined by section 273 of the Criminal Code, murder in the first degree is the unlawful killing of a human being with premeditated malice; murder in the second degree is the unlawful killing of a human being with malice but without premeditation. 18 U.S.C.A. § 452. According to section 274, manslaughter is the unlawful killing of a human being without malice. 18 U.S.C.A. § 453.

The statute under which appellant was indicted and convicted, 18 U.S.C.A. § 253, is as follows:

"Whoever shall kill, as defined in sections 452 and 453 of this title, any * * * special agent of the Division of Investigation of the Department of Justice * * * while engaged in the performance of his official duties, or on account of the performance of his official duties, shall be punished as provided under section 454 of this title."

Title 18, § 454, just referred to, is as follows:

"Every person guilty of murder in the first degree shall suffer death. Every person guilty of murder in the second degree shall be imprisoned not less than ten years and may be imprisoned for life. Every person guilty of voluntary manslaughter shall be imprisoned not more than ten years. Every person guilty of involuntary manslaughter shall be imprisoned not more than three years, or fined not exceeding $1,000, or both."

It is provided in section 330 of the Criminal Code, 18 U.S.C.A. § 567, that in all cases where the accused is found guilty of the crime of murder in the first degree, the jury may qualify the verdict by adding thereto "without capital punishment;" and whenever the jury shall return a verdict thus qualified the person convicted shall be sentenced to prison for life.

We shall set forth a short summary of the evidence, and in doing so we follow quite closely the statement as found in appellant's brief:

George W. Barrett, a Kentuckian, fifty-five years old, with several aliases, began dealing in stolen automobiles in 1931. His method was to buy an automobile, obtain title papers for it, steal an automobile of similar description, change its motor numbers to correspond with those on the purchased car, obtain duplicate title papers, and then sell the stolen car to some dealer. In 1935 he was living in Hamilton, Ohio, where a brother of his (then in jail) had a home, and he occasionally visited another brother of his in College Corner, Indiana, where he sometimes received mail under the alias of George W. Ball. In 1934, under that alias, Barrett rented an automobile in San Diego, California, drove it to Kentucky, changed its motor numbers, and sold it to one Bierlein. In 1935 appellant rented an automobile in St. Louis, Missouri, drove it to Ohio, changed its motor numbers to correspond with those on a new car he purchased through the Central Motor Company of Hamilton, Ohio, and sold it to the same car dealer who on August 2, 1935, sold it to one Thomas Farmer. Appellant knew that these were federal offenses. The manager of the Central Motor Company happened to learn that the car sold to Farmer bore the same motor number as the new car which it had sold to Barrett later that day, and the manager gave that information to Donald McGovern, a special

agent of the Division of Investigation of the Department of Justice.

For about four years appellant had been suspected by the Division of Investigation of the United States Department of Justice as a violator of the National Motor Vehicle Act. After the sale of the car to Farmer on August 2, 1935, special agents McGovern and Klein, from the Cincinnati office of the Division, were ordered to investigate appellant's activities in stolen cars. After investigation, they reported to their superior officer on August 15, 1935, that Barrett's brother at College Corner received mail under the name of George W. Ball; that they had traced several cars which had been stolen by Barrett, to Hamilton, Ohio, and that one of the cars bore a number identical with that on another car handled by Barrett; that they had inspected two of the cars stolen by Barrett and found that the original motor numbers had been filed off and new numbers stamped on. On August 16, 1935, word was received at the Cincinnati office that Barrett was then in the office of the Central Motor Company at Hamilton, Ohio. By that time one of the cars was identified as having been stolen from San Diego, California, for which a warrant was out against Barrett from the police of that city, and the other as having been stolen from St. Louis, Missouri. Thereupon, Klein requested the police at Hamilton, Ohio, to arrest Barrett. They failed to find him, apparently because he had been warned by a loiterer at the police station who was friendly to him. Barrett had been expecting arrest by federal officers.

On receipt of this information from his friend, appellant left Hamilton with no intention of returning. He drove to College Corner to see his brother and on the way there he changed license plates on the car he was driving from Indiana to Ohio plates. At College Corner he went to his brother's house, where he secured a loaded gun which he wrapped in a cloth, and started back to his car which was parked more than a block from his brother's home. Upon learning that the Hamilton police had not arrested Barrett, agents McGovern and Klein were instructed by their superior officer to go to Hamilton and also to College Corner and apprehend Barrett. They had no warrant, and applied for none; for at that time the office of the District Attorney was closed. They wore no distinctive uniforms, and they drove a Buick automobile

without distinctive markings in the way of official insignia. Not locating Barrett at Hamilton, they proceeded to College Corner, where the dividing line between Ohio and Indiana passes through. Here the agents parked near the residence of Barrett's brother, saw a man having the description of Barrett, looked at the motor number of his car during his absence and ascertained that it was the motor number of the car Barrett had bought from the Central Motor Company on August 2, 1935. Klein telephoned the sheriff's office at Hamilton for aid in making the arrest of Barrett, and he and McGovern then parked near Barrett's car and waited for his return.

In a short time Barrett came walking back toward his car with a package in his hand, which later proved to be the gun wrapped in a towel. As he started to unlock the car door, McGovern and Klein started their car, turned and drove to Barrett's car thinking he was attempting to escape them. Barrett turned from his car and started rapidly up a nearby alley toward a tree. Klein jumped from the government car as they passed Barrett's parked car and called to Barrett, "Stop, we are federal officers!" Barrett turned, unwrapped his gun, and, before McGovern could get out of his car or see what was happening, shots were heard by McGovern and residents in the city. McGovern got to the scene of action and fired at Barrett. Barrett's shots had killed Klein; and shots from either McGovern or Klein had pierced both of Barrett's legs and he had fallen. McGovern, however, testified positively that he was the one who had shot Barrett, and we think the evidence supports McGovern's statement in this respect, beyond all reasonable doubt.

At the trial of this cause appellant was represented by his own attorney from Hamilton, Ohio. After the verdict, that attorney filed a motion for a new trial but declined to represent appellant further and was not present at the court's ruling on the motion. Thereupon, the district judge appointed two eminent members of the bar of that district to represent the appellant. They were present when the motion for a new trial was overruled, and, at appellant's request, they prosecuted this appeal.

The following facts were either admitted or established beyond controversy and are not now disputed: (1) Appellant killed Klein on August 16, 1935, at College Cor-

ner, Indiana; (2) at that time Klein was a duly appointed and acting special agent of the Division of Investigation of the Department of Justice; (3) appellant was guilty of violating the National Motor Vehicle Theft Act (18 U.S.C.A. § 408); (4) Klein, together with McGovern, also a special agent of the Division of Investigation of the Department of Justice, had gone from the Cincinnati office to Hamilton and thence to College Corner, Indiana, for the purpose of apprehending appellant, without any warrant for his arrest, but with reasonable ground to believe that appellant had been guilty of violating the National Motor Vehicle Theft Act; (5) on the same day, for some hours before the killing, federal officers were seeking to apprehend appellant for a violation of the National Motor Vehicle Theft Act in transporting stolen vehicles from one state to another and selling them, and appellant was so advised; (6) at the time of Klein's death appellant intended to leave College Corner, but the reason for his departure was disputed. The principal facts about which there was a dispute in the trial were: (1) Whether appellant knew or had reasonable ground to believe before the fatal encounter that Klein and McGovern were federal officers who were attempting to arrest him for a federal offense, (2) whether appellant had reasonable ground to believe at the time of the encounter that he was then being attacked by Kentucky feudists with whom he had had trouble, (3) whether Klein or appellant was the aggressor in the shooting, (4) whether the killing was in self-defense, or if not, whether appellant acted with premeditated malice in the fatal shooting.

We think there can be no question but that appellant at the time of the shooting not only had reasonable ground to believe, but actually knew, that Klein and McGovern were federal officers and were attempting to arrest him for a federal offense. The evidence discloses that appellant's companion, shortly before the fatal encounter, notified appellant to this effect. McGovern's testimony was that Klein told appellant that they were federal officers. While appellant did not admit that he heard the remark of Klein, yet within three to five minutes after the shooting, he said to a resident of College Corner, with respect to the identity of the deceased, "He is a government man and it was either him or me and I beat him to the draw." He told another citizen immediately after the shooting that the deceased was a government

man. In addition to this evidence, appellant in his signed confession said that he had been told at Hamilton on August 16, 1935, that federal men were laying traps for him, that when he got to College Corner he saw two men get out of the nearby car just as he started to get into his car, and that one or both of those men said something to him and from what was said he knew that they were either federal officers seeking his arrest, or someone coming to "take him for a ride."

At the trial appellant contended that at the time and immediately preceding the killing of Klein, he thought he was being sought by certain parties from his native state, Kentucky, who were seeking to take his life. On this subject he testified that he was in a shooting affair in Kentucky in September, 1932, in which some of his relatives were involved; that in June, 1935, he received news from Kentucky mentioning the killing of an individual who was some relation of his; that in July he began wearing blue glasses and in August dyed his hair black; that on August 10, a letter which he had lost, from a writer whose name he did not mention, told him to be on the lookout for certain parties from Kentucky who were heading for Hamilton disguised as officers; that he saw a car with a Kentucky license plate on August 10, and that on August 15, while he was ordering breakfast, a man whom he had never seen before came into the eating place and said, "Your suspicion is correct. They are here. I saw them on Sander Avenue not five minutes ago." He further testified that when he was driving in Hamilton that day he saw the same car with the same men, whose faces he would never forget; that on his way to College Corner later that day a car followed him part way with men on front and rear seats with large revolvers; that after he got his revolver from his brother's house and started to get in his car at College Corner, he heard a car coming and a man was on its running board with an automatic in his hand; a man was standing on the sidewalk with what he thought to be a machine gun in his hand, and near a tree another man was standing whom he thought he had seen in Hamilton, so he ran and started to shoot.

It is not necessary to go into further details of appellant's testimony in this respect. A study of all the evidence convinces us beyond all reasonable doubt that appellant at the time of the shooting did not believe and had no reasonable ground to be-

lieve that Klein and McGovern were Kentucky feudists seeking his life.

We are further convinced from a perusal of the record that Barrett was the aggressor in the shooting. His statements in this respect are inconsistent. One of his first statements was that he had beaten the government man to the draw. Another was that he fired to save his own life; at another time he said that he had shot Klein but that Klein had shot him first; in his signed confession he said, "I do not know whether I fired first or whether the man who followed me down the alley fired first, but we both began firing at each other." McGovern testified that Klein had not drawn his revolver before leaving the car; that he did not see him with a gun in his hand prior to the shooting. He said he heard several shots and heard Klein say, "O, Lord, I am shot," but he was not where he could see Klein or appellant while the shots were being exchanged between them; that when he moved toward the scene of action he saw appellant moving around a tree leveling a revolver at him, McGovern, and that he then fired at appellant and tried to kill him; that his was the last shot fired and that it hit appellant and brought him to the ground.

The verdict of the jury necessarily includes the finding that appellant was the aggressor and that the killing of Klein was premeditated and was not in self-defense. We think the evidence was ample to support the findings of the jury in these respects and that conclusion is not disturbed by the latitude which was permitted in the cross-examination of appellant to which at the time objection was urged and is now urged.

During the cross-examination of appellant, inquiry was permitted into the many activities in Kentucky with which appellant was connected or concerned. It must be remembered that when a defendant takes the stand he puts his veracity directly in issue, and when he relies on self-defense to the charge of murder, his character with respect to the elements which constitute murder is brought directly in issue, and under such circumstances it is quite necessary that the court permit a reasonable latitude in cross-examination with respect to matters which will reveal that character.

It must also be borne in mind that appellant, in order to avoid the charge of malice and premeditation, and to show that he had no knowledge that Klein was a federal officer, relied strongly on the fact that he had had trouble in Kentucky which had resulted in the loss of several lives; that a feud had thereby been created and that his life was in constant danger; that he was in mortal terror of meeting his enemies from that state. It was therefore altogether proper for the court to permit interrogation along those lines, to show just how great was his fear, and the basis for it. The examination disclosed that he frequently returned to Kentucky and to the place where he said the feud existed. The government sought to elicit from him why he had made those visits if he really had the mortal fear which he claimed to have. His answer to this line of questioning was that it was on account of his love for his people and his anxiety to see them. We think the court made no mistake in permitting the cross-examination of defendant for this purpose. It happened, as usually happens in such cases as these, that there were a few questions and answers which perhaps should not have been asked or answered, but we have found none which were harmful to the appellant or helpful to the government, and we think there was no error in this respect.

There is one issue raised which appellant stresses with considerable emphasis. McKee was a government witness. He was also a special agent of the Division of Investigation and was a guard over appellant while he was at the Ft. Hamilton Hospital. His direct examination related to the identification of appellant's gun and the towel in which it was wrapped when he brought it out of his brother's house. He testified further that appellant had talked to him about the gun and towel. On cross-examination by appellant's counsel, it was sought to disclose that this witness sought to make arrangements for appellant to commit suicide by jumping out the window. Appellant's counsel put the following questions, and the following answers were made:

Q. "Did you or not say to the defendant Barrett that you would make the arrangement for him at any time he wanted to commit suicide?"

A. "There was no conversation to that effect, but I can tell you the conversation."

Q. "Well, I would rather cross examine you. In words or in substance, did you say to Mr. Barrett, there, that you would

open the window, in the event he wanted to commit suicide?"

The Court: "He answered that a moment ago."

Q. "Do you say 'Yes' or 'No?'"

A. "I said 'No.'"

Q. "But there was some such conversation, I believe you said?"

A. "Yes, sir, there was. As a matter of fact, the window was already open.".

Q. "But suicide was mentioned?"

A. "Yes, he mentioned it.

Mr. Rice (appellant's attorney): "I move to strike that out as not responsive."

The Court: "Overruled."

Mr. Rice: "An exception."

Re-direct examination:

Q. "You may tell what the conversation was, about suicide."

Mr. Rice: "I object to that."

The Court: "Overruled."

Mr. Rice: "An exception."

A. "He remarked that he had just as soon be dead."

Q. "Who said that?"

A. "Barrett."

Q. "Tell us all that was said by Barrett in that conversation."

A. "He said that he had nothing else to live for, that he wanted to meet his dear old mother in heaven and explain to her why he had killed her, and he said, 'Would you help me over to the window?' and I said, 'Yes,' I would, and I said, 'I will push the screen up for you, but I don't think you would jump, I don't think you have got nerve enough.'"

Q. "Was that the end of that conversation?"

A. "That was the end of that conversation."

Q. "And did you help him to the window?"

A. "I did not."

Mr. Rice: "I move to strike that out, your Honor."

The Court: "Overruled."

Mr. Rice: "An exception."

Mr. Nolan (United States Attorney): "That is the first I knew about that suicide business, your Honor."

It is urged by appellant that while he first went into this subject matter, yet it was wholly irrelevant to the issue as to whether he was guilty or innocent of the crime with which he was charged, and that it was improper to admit in evidence the further conversation. It is true that it was not directly relative to the main issue, but it was altogether relevant as affecting the credibility of the witness, McKee. Appellant attempted to show by this conversation that McKee had tried to get appellant to commit suicide. No one would deny that such evidence, if true, would well nigh destroy the effect of the witness's testimony, hence it was perfectly proper for appellant to elicit that information if he could. It was quite apparent that appellant's counsel did not want the further conversation, and he refused to permit McKee to give it, and said that he preferred to cross-examine him. It is true that the cross-examination did not fully support appellant's contention that McKee had tried to influence appellant to commit suicide, yet it furnished a basis from which appellant's counsel might rather adroitly argue before the jury that McKee was willing to help him commit suicide. However, when the further conversation went in the record by permission of the court, it completely exonerated McKee from such questionable conduct.

Moreover, before the case went to the jury, the District Judge called into his chambers appellant's attorney and the District Attorney and stated to both of them that he would strike from the record McKee's further statement of the conversation, providing appellant would withdraw his contention that McKee had attempted to get appellant to commit suicide. This the appellant refused to do. Under these circumstances there was no error.

■ There is no hard and fast rule applicable to all such cases by which a trial court can say definitely what the precise limits of cross-examination are. There are general rules which are applicable, but even these are not definite in their application to every state of facts. Of course, as a general rule, one crime cannot be proved by the proof of another, but where a defendant relies upon self-defense and testifies as a witness, the extent of the cross-examination is left largely to the sound discretion of the court, for in determining the question of malice and premeditation and the priority of aggression, the latitude of cross-examination of the defendant should be reasonably extended under a sound judicial discretion.

We find nothing in this record to indicate that the District Court in any way

abused that discretion. His instructions were very carefully and properly drawn, and no objections are made to them by either the appellant or the Government. It is admitted that objections were not made on behalf of appellant to many of the questions here urged as improper, and that many objections were general and not specific, and we are asked to extend to appellant the privileges of section 269 of the Judicial Code (28 U.S.C.A. § 391), which permits this court to correct serious trial errors, fatal to the right of the accused, though not challenged by objection, motion, exception or even assignments of error. The District Attorney has likewise requested us to consider the record as if objections or exceptions had been made or taken by appellant to any part or parts of the record to which appellant now objects. This we have done, but we find no error.

The indictment was challenged by a special and a general demurrer, and appellant excepted to the court's ruling against him in those respects. No error is here predicated on those rulings but we have examined them and are convinced that they were proper.

■ A further contention was made by appellant that the court erred in trying the case in Marion County, rather than in Union County, where the crime occurred. Section 40 of the Judicial Code (28 U.S.C.A. § 101), provides that the trial of offenses punishable with death shall be had where the offense was committed, where that can be done without great inconvenience. The record discloses the findings of the District Court that the trial of this cause could not be had in Union County, Indiana, without great inconvenience. There was no error in this respect.

■ It is further contended by appellant that it was beyond the power of Congress to enact the statute under which he was indicted, because the punishment of such crime is exclusively within the jurisdiction of the state wherein it was committed. We think there is no merit in this contention. See In re Neagle, 135 U.S. 1, 10 S.Ct. 658, 34 L.Ed. 55.

■ Lastly, it is contended that Klein at the time of his killing, was not engaged in the performance of his official duties, and was not killed on account of the performance of his official duties within the meaning of the statute, for the reason that at the time of such killing he had no warrant or other process for the defendant, and the defendant had not committed any felony in his presence. There is no merit in this contention, for it is not denied that Klein at the time of the attempted arrest had reasonable ground to believe that appellant had been guilty of violation of the National Motor Vehicle Theft Act and there was likelihood of his escape. Under such circumstances, it was not necessary to have a warrant, and the court instructed the jury properly in this respect. 5 U.S.C.A. § 300a.

Judgment affirmed.