**UNITED STATES v. BELL et al.**

No. 15759.

District Court, S. D. California,
Central Division.

Feb. 13, 1943.

* * *"

Leo V. Silverstein, U. S. Atty., and Norman Neukom, Asst. U. S. Atty., both of Los Angeles, Cal., for plaintiff.

Lorrin Andrews, of Los Angeles, Cal., for defendants.

A. L. Wirin, of Los Angeles, Cal., for American Civil Liberties Union, amicus curiae.

YANKWICH, District Judge (after stating the facts as above).

Offenses in which persons who profess heterodox doctrines are involved present problems which either do not exist in ordinary prosecutions or, if they do exist, are not pressed for solution. This for the reason that once we enter the realm of opinion, our American tradition of liberalism makes many persons and groups who do not condone the acts of the particular defendants, or do not share their ideas or the norms of their philosophy, interest themselves in their fate. They do this in pursuit of our ideal of free expression and to guard against the danger that persons might be prosecuted or condemned, contrary to the spirit of our constitutional liberty. *It is right that it should be so.* For, ultimately, the test of our belief in freedom of expression is "freedom for the thought that we hate".[1] At the same time, in considering the motions to suppress and return evidence, we should not overlook the fact that the offense charged here, while connected with the realm of ideas, is, in reality, conspiracy. 50 U.S.C.A. § 34.

Conspiracy, ordinarily, consists in uniting to violate any of the hundreds of statutory provisions contained in the Criminal Code and the regulatory statutes of the United States. Or it may consist in conspiring to defraud the United States of money or property, or merely to interfere with the proper functioning of an agency of the United States.[2]

The indictment here *does not* charge the substantive offense, the violation of the Espionage Act of 1917. 50 U.S.C.A. § 33. Nor does it charge the conspiracy denounced by Section 37 of the Criminal Code. 18 U.S.C.A. § 88. It charges a specially prohibited form of conspiracy,—conspiracy to violate the Espionage Act of 1917, 50 U.S.C.A. § 34, and avers:

"1. It was a part of the aforesaid conspiracy that the said defendants and co-conspirators and divers other persons, to the Grand Jurors unknown, subsequent to December 8, 1941, did print, publish, distribute, circulate and cause to be circulated

---

[1] Holmes, J., in his dissent in United States v. Schwimmer, 1929, 279 U.S. 644, 654, 49 S.Ct. 448, 73 L.Ed. 889.

[2] Cr.Code § 37, 18 U.S.C.A. § 88; See my opinion in United States v. Furer, D.C.Cal.1942, 47 F.Supp. 402, 405.

throughout California and the United States, bulletins, weekly messages, telegrams, brochures, pamphlets, books, charts, motion picture film, slides, photographs, drawings, cartoons, under the following names, among others: 'Mankind United', 'Would You be Informed?', 'The ABC Bulletin', 'The Truth About England', 'Weekly Message No. 22', 'We Are Not Cattle', a large size chart entitled 'Illustrated Lecture No. 1.'.

"2. It was further a part of the aforesaid conspiracy that the said defendants and co-conspirators and divers other persons to the grand jurors unknown, subsequent to December 8, 1941, would organize and cause to be organized, utilize, support, use, control and otherwise aid, at divers places within the United States of America, and particularly within the State of California, committees, groups, bureaus, teams, and units, organized under the following names, among others:

> Mankind United
> Group Units or Organizations
> George G. Ashwell Bureau
> A. P. Mason Bureau
> Ruth Ann Bureau
> The Beacon Bureau
> A. P. Burns Bureau
> Ray of Light Bureau
> Progressive Bureau
> Hall-Gardner Bureau
> Three Maples Bureau
> The Auburn Bureau
> The Faith Grace Bureau
> The Kathleen Bureau
> The Guiding Light Bureau
> The A. P. Roberts Bureau
> The Olive Branch Bureau
> International Institute of Universal Research & Administration; also known as International Registration Bureau
> International Legion of Vigilantes
> Timely Books Bureau
> Timely Books Library
> Bulletin Printing Company.

"3. It was further a part of the aforesaid conspiracy that the said defendants and co-conspirators and divers other persons to the grand jurors unknown, would under the name of the movement commonly referred to as 'Mankind United', conduct lectures, meetings, and instruction groups from time to time subsequent to December 8, 1941, down to and including the date of the filing of the herein indictment at various cities and towns in the United States, particularly in the state of California, at which meetings and instruction groups, followers, associates and many persons, the names of which persons are to the grand jurors unknown, would attend and at which meetings, lectures, and instruction groups, the various defendants and other persons not here indicted were, among other designations, frequently referred to by code or symbols, or by numerical designation, and that in particular, as to the defendants herein indicted, they were, among other designations, frequently known as follows:

"Arthur L. Bell, the Speaker, the Divisional Superintendent, M. R. Speaker, Department A. Department B, the Voice, the Voice of a Right Idea.

"George Gouverneur Ashwell, No. 5, Ashwell Bureau Manager.

"Homer G. Wilcox, No. 20, Beacon Bureau Manager, Chairman, County Supervisor.

"Bay Burns Sharpe, No. 22, A. P. Burns Bureau Mgr.

"Eugene Wadsworth Brown, No. 11, Ruth Ann Bureau Mgr.

"A. Ray Elsea, No. 23, Ray of Light Bureau Manager.

"J. F. Burkey, No. 4, Auburn Bureau Manager.

"Max Theodore Miller, No. 12, A. P. Mason Bureau Mgr.

"Harold Von Norris, No. 15, Kathleen Bureau Manager.

"William Duerst, Enrollee, Beacon Bureau.

"Maude Askew, Lieutenant Beacon Bureau, and Area Bureau Manager.

"Pauline Kelso, Lieutenant Beacon Bureau, Area Bureau Manager.

"Lawrence Cook, Captain Beacon Bureau.

"Ed-Gilson, Lieutenant Beacon Bureau, Area Bureau Manager.

"Shanna Jakeman, Captain Ruth Ann Bureau, District Bureau Manager.

"Jacob Gloeckler, Enrollee, A. F. Mason Bureau * * *"

The motions seek to suppress and return evidence secured by the members of the Federal Bureau of Investigation, incidental to the arrests of the named defendants. No search warrants were obtained, except in the case of Burkey, but it authorized search at a wrong address. The officers had with them a warrant of arrest for one of the defendants only,—Elsea. Therefore, the first question to be

considered is whether the arrests were legal.

Section 300a of Title 5 U.S.C.A., provides, among other things that [The members] of the Federal Bureau of Investigation of the Department of Justice are empowered to serve warrants and subpœnas issued under the authority of the United States; to make seizures under warrant for violation of the laws of the United States; *to make arrests without warrant for felonies which have been committed and which are cognizable under the laws of the United States, in cases where the person making the arrest has reasonable grounds to believe that the person so arrested is guilty of such felony and, where there is a likelihood of the person escaping before a warrant can be obtained for his arrest,* but the person arrested shall be immediately taken before a committing officer. * * *"

It is argued that, to warrant an arrest under this enactment, there must be, first, the commission of a felony, and there must be engendered, in addition, in the mind of the officer, a reasonable ground for believing that the particular person is guilty of the offense.

■ This section is *akin to Sections 836 and 837 of the Penal Code of California.* Subdivision 3 of these sections permit a peace officer or a private person to make an arrest "when a felony has in fact been committed, and he has reasonable cause for believing the person arrested to have committed it."

"The reasonable ground or suspicion, which justifies an arrest without a warrant, has been declared to be a state of facts which would lead a man of ordinary care and prudence to believe, or entertain an honest and strong suspicion, that the person is guilty of an offense. Courts seem very solicitous about the well-intentioned acts of police officers. In this, they follow the statement of Lord Mansfield (made in 1779) that, in trying the legality of acts of officers,

" 'They ought not to suffer from a slip of form, if their intention appears by evidence to have been upright * * *. The principal inquiry to be made by a court of justice is *how the heart stood?* And if there appears to be nothing wrong there, great latitude will be allowed for misapprehension or mistakes" [3]

Courts thus make reasonableness not a matter of abstract theory, but a pragmatic question, to be determined, in each case, in the light of its own circumstances.[4]

This is also the view of the Supreme Court, as expressed in Go-Bart Importing Company v. United States, 1932, 282 U.S. 344, 357, 51 S.Ct. 153, 158, 75 L.Ed. 374: "There is no formula for the determination of reasonableness. Each case is to be decided on its own facts and circumstances."

■ In the only two cases which have arisen under § 300a, since its enactment, two circuit courts of appeal have applied to it this general doctrine. Specifically, they have ruled that it *does not* impose on members of the Federal Bureau of Investigation any greater burden than that imposed, generally, by state law, on peace officers or arresting officers, and that, in determining whether the acts of the officer were in the performance of his functions, the test is the existence of reasonable grounds for belief that a particular person has been guilty of a violation of law.

In Barrett v. United States, 7 Cir., 1936, 82 F.2d 528, 534, in deciding that an agent of the Federal Bureau of Investigation was killed while performing his duties, the Court said:

"Lastly, it is contended that Klein at the time of his killing, was not engaged in the performance of his official duties, and was not killed on account of the performance of his official duties within the meaning of the statute, for the reason that at the time of such killing he had no warrant or other process for the defendant, and the defendant had not committed any felony in his presence. There is no merit in this contention, for it is not denied that Klein at the time of the attempted arrest had reasonable ground to believe that appellant had been guilty of

---

[3] See Yankwich: The Lawless Enforcement of the Law, IX So.Cal.Law Review, 1935, pp. 19 and 20.

[4] 4 American Jurisprudence, 1939, Arrest, § 48, pp. 33, 34; United States v. Gowen, 2 Cir., 1930, 40 F.2d 593; United States v. De Vasto, 2 Cir., 1931, 52 F. 2d 26, 29, 78 A.L.R. 336; Kwong How v. United States, 9 Cir., 1934, 71 F.2d 71; Rocchia v. United States, 9 Cir., 1935, 78 F.2d 966; Papani v. United States, 9 Cir., 1936, 84 F.2d 160; Leong Chong Wing v. United States, 9 Cir., 1938, 95 F.2d 903; United States v. Feldman, 3 Cir., 1939, 104 F.2d 255.

violation of the National Motor Vehicle Theft Act [18 U.S.C.A. § 408] and there was likelihood of his escape. Under such circumstances, it was not necessary to have a warrant, and the court instructed the jury properly in this respect. 5 U.S.C.A. § 300a."

A similar ruling was made in Suhay v. United States, 10 Cir., 1938, 95 F.2d 890, 895, in which certiorari was denied by the Supreme Court 304 U.S. 580, 58 S.Ct. 1060, 82 L.Ed. 1543. The Court said: "An agent of the Bureau of Investigation is expressly authorized by statute to make an arrest without a warrant for a felony that is cognizable under the laws of the United States if he has reason to believe that the person arrested is guilty of such felony and there is likelihood that such person will escape before a warrant can be obtained. 5 U.S.C.A. § 300a. *Baker had information that appellants had robbed the bank at Katonah, and that a warrant had been issued for their arrest.* He was clearly warranted in attempting to make the arrest." (Italics added.)

In both cases, arrests were made, not on the basis of any investigation conducted by the arresting agent, but on knowledge imparted to him by officers in other states. If, before an arrest without a warrant is legal, it must be shown that a crime has actually been committed, we would have to try the cause on a motion to suppress. And before an officer could justify an arrest without a warrant, he would have to prove, in court, beyond a reasonable doubt, the commission of the crime. Then, only, could he show that he had reasonable ground to believe that the defendant committed it.

It would follow from this, that the defendant would be entitled to a trial by jury, because the commission of the offense is one of the elements of the corpus delicti, which the Government must prove on the trial of each criminal action. We would have to call a jury in advance of the trial, in order to determine that the crime *had, in reality,* been committed.

 I cannot lead myself to believe that the Congress of the United States intended to establish such a procedure. Rather, am I of the view that they merely re-enacted what has been the law of the various states for decades, namely, that when an officer has reasonable ground to believe that a person has committed an offense, he may exercise rights like those conferred by § 300a.[5]

We need not condone the extreme to which some courts have gone,—particularly the courts of California,—in justifying illegal and brutal acts of officers. Persons, who, in the exercise of their official prerogatives, are guilty of lawlessness, or go beyond what is, in strictness, necessary to the performance of their duties, do a great disservice to the commonwealth and to the cause of law.

Those charged with law enforcement should be, in their relations with those accused of crime, the very personification of lawfulness.

We test what was done in this particular case by these principles. The testimony shows that the activities of these defendants had been under official scrutiny for a long period of time. The investigation

---

[5] 4 American Jurisprudence, 1939, Arrest, § 25, p. 18: "An officer with authority to conserve the peace, has, in making arrests, all the common-law authority of a constable or watchman and may, without a warrant, arrest any person who has committed a felony in or out of his presence or who has attempted to commit a felony in his presence. *He may arrest any person who he, upon reasonable grounds, believes has committed a felony, even though it afterwards appears that no felony was actually perpetrated.*" (Italics added.)

It is belief engendered by facts, and not their legal conclusiveness in establishing guilt which determines the existence of probable cause for arrest.

As said in 4 American Jurisprudence, 1939, § 48, pp. 33, 34: "Probable cause for an arrest has been defined to be a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in believing the accused to be guilty. Yet probable cause *does not depend on the actual state of the case in point of fact, as it may turn out upon legal investigation,* but on knowledge of facts and circumstances which would be sufficient to induce a reasonable belief in the truth of the accusation. It is not necessary for the officer to see and know that the law is being violated. Nor is it necessary for him *to satisfy himself beyond question* that a felony has in fact been committed, to justify an arrest without a warrant, though he may not act on unsubstantial appearances or unreasonable stories." (Italics added.)

994

was state-wide. The defendants reside in different parts of the State of California. Officers in the San Francisco office of the Federal Bureau of Investigation, among them, one of the officers who participated in one of the arrests, actually watched some of the activities of the persons who were ultimately charged with the conspiracy, listened in at their meetings, and were, in other ways, familiar with the acts out of which the prosecution grew. The secret indictment was returned on December 17, 1942, and warrants for the arrest of each of the defendants were issued under the seal of our court on the same day.

Teletype notice of this was communicated to the officers who made the arrests in the San Francisco area. They acted on it, and the arrests were made on the following morning.

I am satisfied that reasonable ground existed for the arrests. When a Grand Jury has indicted, after an investigation known to officers, and these officers are informed of the fact of the return of a secret indictment, and that warrants have actually been issued, although the warrants are not then sent to them, all the conditions for making an arrest without a warrant, under § 300a exist.

I, therefore, hold that the arrests in the San Francisco area, made without warrants, were legal.

Their legality is not impaired by the fact that the officers conducted a search incidental to the arrests and delayed taking the persons before a committing officer for a few hours. In the case of one of the defendants,—Bell—I think that he caused most of the delay himself, by his refusal to allow the officers to enter his home until "he got good and ready", and was fully dressed. If his appearance in court is any criterion, he dresses with meticulous care. And it probably took him longer than it takes a soldier to get into his clothes when reveille sounds. The fact, also, that every one of the defendants was allowed to have breakfast before anything further was done, would indicate that a good deal of the alleged waste of time was made necessary by the circumstances in the case, and the acts of the defendants themselves.

The word "immediately", as used in § 300a, does not mean an hour or fifteen minutes, or any other definite period of time. Courts have always held that when a duty is imposed to do an act "forthwith" or "immediately", the test is: Was it done within a time reasonable, under the particular circumstances?[6]

The circumstances under which the arrests were made here warrant the conclusion that, in view of the nature of the charge and of the time consumed in allowing the persons involved to prepare themselves for the trip to the committing officer, and the incidental search, there has been a substantial compliance with the requirements of § 300a.

---

[6] See: California Penal Code, § 849; Vernon v. Plumas Lumber Co., 1925, 71 Cal.App. 112, 234 P. 869; Peckham v. Warner Bros. Pictures Inc., 1939, 36 Cal.App.2d 214, 218, 219, 97 P.2d 472; 22 American Jurisprudence, 1939, False Imprisonment, Sec. 20, p. 366. The following is from Anderson v. Goff, 1887, 72 Cal. 65, 73, 13 P. 73, 76, 1 Am.St. Rep. 34:

"The term 'forthwith,' when applied to the performance of an act, imports that it shall be performed as soon as by reasonable exertion, confined to that object, it might be, and which must consequently vary according to the circumstances of each particular case. 3 Chit.Pr. 112.

"In Roberts v. Brett, 36 Engl.L. & Eq., 358, it was held to mean 'within a reasonable time.'

"When a defendant is ordered to plead forthwith, he must plead within 24 hours. Whart.Law Dict. In other matters of practice the word has come to have the same meaning. [Champlin v. Champlin] 2 Edw.Ch. [N.Y.] 328; Moffat v. Dickson, 3 Colo. 313; Bouv.Law Dict.

"'Like the term 'immediately,' it is not in law to be necessarily construed as a time immediately succeeding, without an interval, but an effectual and lawful time, allowing all the 'adjuncts and accomplements' necessary to give an act full legal effect to be performed.

"In Van Wyck v. Hardy, 20 How.Prac. [N.Y.] 222, the word 'forthwith' was construed as synonymous with 'all *reasonable* dispatch.'" (Italics added)

And see: "Immediately—within reasonable time", 20 Words and Phrases, Perm. Ed., p. 124 et seq. Accord: Fidelity & Deposit Company v. Courtney, 1902, 186 U.S. 342, 345–347, 22 S.Ct. 833, 46 L.Ed. 1193; Empire State Surety Co. v. Northwest Lumber Co., 9 Cir., 1913, 203 F. 417, 418, 420; Williamson v. Leith, 5 Cir., 1929, 36 F.2d 643, 645; Cucuzza v. Campbell, 2 Cir., 1930, 37 F.2d 31, 33.

█ The arrests without warrants were, therefore, justified, legal and were made under conditions which satisfied the requirements of the rule of law.

We come to the legality of the searches and seizures. The guarantee against unlawful search and seizure is a valuable heritage, dating back to early English political history, and is embodied in the Fourth Amendment to the Constitution of the United States.

█ The guarantee, however, is not against *all* searches and seizures. The guarantee secures persons, houses, papers and effects against "unreasonable" searches and seizures only. A search of one's person or premises, pursuant to a search warrant properly issued, does not violate the constitutional provision. The search of one's premises without a search warrant may be made the ground for a motion to suppress the evidence thus obtained. The erroneous denial of this motion will invalidate a conviction secured with the aid of this evidence.[7]

This doctrine of the Supreme Court of the United States, expressed in Weeks v. United States, 1914, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652, L.R.A.1915B, 834, Ann. Cas.1915C, 1177, and the cases which have followed it, is repudiated by most of the states in the Union, including California[8] and New York.[9]

With Olmstead v. United States (1927, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944, 66 A.L.R. 376), the Supreme Court began to whittle it away. They are still doing it. Some have expressed the thought that the decision in Nardone v. United States, 1939, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307, was a repudiation of the Olmstead case. But a reading of that opinion shows that the conclusion there reached was forced upon the Court by the interpretation it placed on the prohibition against intercepting telephone messages contained in the Communications Act of 1934, 47 U.S.C.A. § 151 et seq. The latest cases on the subject, Goldstein v. United States, 1942, 316 U.S. 114, 62 S.Ct. 1000, 86 L.Ed. 1312, and Goldman v. United States, 1942, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322, demonstrate that even the Court as at present constituted does not intend to repudiate the modification introduced by the Olmstead case.

█ In the Goldman case, which involved the use of a dictaphone conversation, Mr. Chief Justice Stone and Mr. Justice Frankfurter state that, if the majority of the Court had been willing, they would have joined in overruling the Olmstead case. But, as the majority was not willing to do so, they merely gave their adherence to the dissenting views in that case. So the members of the Supreme Court, even today, do not seem to agree on some of the essential questions arising from searches and seizures. One thing, however, is certain. Searches and seizures without warrants are not illegal under all circumstances. Incidental to an arrest, there may be seizure on the premises of articles, books and papers which are the instruments, fruits, or evidence of the crime or connected with its commission or which supply proof relating to the transaction out of which it arose.

Marron v. United States, 1927, 275 U.S. 192, 198, 48 S.Ct. 74, 77, 72 L.Ed. 231, by an unanimous Court, contains a good, general statement of the rule.

"When arrested, Birdsall was actually engaged in a conspiracy to maintain, and

[7] See: Weeks v. United States, 1914, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652, L.R.A.1915B, 834, Ann.Cas.1915C, 1177; Amos v. United States, 1921, 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654; Byars v. United States, 1927, 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520; Go-Bart Importing Co. v. United States, 1931, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374; Gouled v. United States, 1921, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647; Gambino v. United States, 1927, 275 U.S. 310, 48 S.Ct. 137, 72 L.Ed. 293, 52 A.L.R. 1381; Nueslein v. District of Columbia, 1940, 73 App.D.C. 85, 115 F.2d 690; Lowrey v. United States, 8 Cir., 1942, 128 F.2d 477.

For a recent scholarly discussion of the entire subject, see J.A.C.Grant, Circumventing the Fourth Amendment, 1941, 14 So.Cal.Law Rev., 359; J.A.C.Grant, Constitutional Basis of the Rule Forbidding the Use of Illegally Seized Evidence, 1941, 15 So.Cal.Law Rev. 60.

[8] People v. Mayen, 1922, 188 Cal. 237, 205 P. 435, 24 A.L.R. 1383; People v. Gonzales, 1942, 20 Cal.2d 165, 124 P.2d 44. And see J.A.C.Grant, Search and Seizure in California, 1942, 15 So.Cal.Law Review 139.

[9] People v. Defore, 1926, 242 N.Y. 13, 150 N.E. 585, *opinion written by Judge Cardozo.* On the whole subject, in its historical aspect, see 8 Wigmore on Evidence, 1940, §§ 2183, 2184; pp. 4-54.

was actually in charge of, the premises where intoxicating liquors were being unlawfully sold. Every such place is by the National Prohibition Act declared to be a common nuisance the maintenance of which is punishable by fine, imprisonment or both. Section 21, tit. 2, Act of October 28, 1919 [c. 85], 41 Stat. 305, 314 (U.S.C., Tit. 27, § 33 [27 U.S.C.A. § 33]). The officers were authorized to arrest for crime being committed in their presence, and they lawfully arrested Birdsall. They had a right without a warrant contemporaneously to search the place in order to find and seize the *things used to carry on the criminal enterprise.* Agnello v. United States, supra, [269 U.S. 20], 30, 46 S.Ct. 4 [70 L.Ed. 145]; Carroll v. United States, 267 U.S. 132, 158, 45 S.Ct. 280, 69 L.Ed. 543, 39 A.L.R. 790; Weeks v. United States, supra, [232 U.S.] 392, 34 S.Ct. 344 [58 L.Ed. 652, L.R.A.1915B, 834, Ann.Cas.1915C, 1177]. The closet in which liquor and the ledger were found was used as a part of the saloon. And, if the ledger was not as essential to the maintenance of the establishment as were bottles, liquors and glasses, it was none the less a part of the outfit or equipment actually used to commit the offense. And, while it was not on Birdsall's person at the time of his arrest, it was in his immediate possession and control. The authority of officers to search and seize the things by which the nuisance was being maintained extended to all parts of the premises used for the unlawful purpose. Cf. Sayers v. United States, [9 Cir.], 2 F.2d 146; Kirvin v. United States [2 Cir., 5 F.2d 282], supra; United States v. Kirschenblatt [2 Cir., 16 F.2d 202, 51 A.L.R. 416], supra. The bills for gas, electric light, water and telephone services disclosed items of expense; they were convenient, if not in fact necessary, for the *keeping of the accounts; and, as they were so closely related to the business, it is not unreasonable to consider them as used to carry it on.* It follows that the ledger and bills were lawfully seized as an incident of the arrest." (Italics added.)

I think that United States v. Lefkowitz, 1932, 285 U.S. 452, 465, 52 S.Ct. 420, 423, 76 L.Ed. 877, 82 A.L.R. 775, has been given exaggerated importance. By some it is thought to modify the Marron case. But, to my mind, it does not do so. What the court condemned was the seizure of all kinds of articles which had nothing to do with the offense charged. The Court said of the papers seized:

"Though intended to be used to solicit orders for liquor in violation of the act, the papers and other articles found and taken were *in themselves unoffending.* The decisions of this court distinguish searches of one's house, office, papers or effects merely to get evidence to convict him of crime from searches such as those made to find stolen goods for return to the owner, to take property that has been forfeited to the government, to discover property concealed to avoid payment of duties for which it is liable, and from searches such as those made for the seizure of counterfeit coins, burglars' tools, gambling paraphernalia, and illicit liquor in order to prevent the commission of crime." (Italics added.)

▮ When the act denounced as an offense is not simple, but complex in its nature, there is no time limit placed by the Courts upon the search or upon the quantity of papers or objects seized.[10]

▮ Thus, in conspiracies to violate the Prohibition Act, or the Internal Revenue laws, for instance, you will find that, in many instances, the search was very extensive. Cartloads of objects were carried away, from barrels of mash to bottles and capping apparatus. One might say, "Well, after the officer saw the mash, smelled it, took a sample of it and carried it away, why should he bother with corks

---

[10] These are the words of the Seventh Circuit Court of Appeals in United States v. Thomson, 1940, 113 F.2d 643, 645, 129 A.L.R. 1291: "In thus disposing of this case we assume: (a) *That neither the length of the search at the time of the arrest, nor the volume of the evidence seized has anything to do with the validity of the search.* One single bit of evidence, no larger than a half carat diamond, may be all that is seized in one case. Thirteen truck loads of liquor, still apparatus, etc., may be taken in another case. The smuggled diamond may be so skillfully concealed that much time is required for the searching officers to locate it, whereas the defendant may be sitting in his still house surrounded by vats of liquor, in the second search, and no time at all required to complete the search. In other words, the reasonableness of the search depends upon the facts in each case, and this applies *to the length of the search and the quantity seized.*" (Italics added.)

and bottles? Possession of bottles' or corks is not a violation of law." Yet the law,—because it considers the search incidental to arrest not only the right, but *the duty of the arresting officer,*—does not draw such fine distinctions.[11]

■ Nor is it the law that, if, as a part of an arrest, there be a search and seizure of objects which may bear on the offense, the seizure, at the same time, of articles not connected with the offense, renders the entire search illegal.

When the cases condemn "exploratory" investigations or "exploratory" seizures, they refer to the unlimited seizures of the

type which occurred in United States v. Lefkowitz, supra, and other cases, where the officers were merely seeking, *in an unrestrained manner,* evidence which did not relate to the offense.

The very nature of this case creates difficulties. We have here, not a conspiracy to do something physical, but a conspiracy to violate the Espionage Act by disseminating doctrines inimical to the public interest in the time of war.

When we consider a search in a case of this character, we cannot say, "Well, the officers should have taken some copies of

---

[11] This is the language of Judge Amidon in Furlong v. United States, 8 Cir., 1926, 10 F.2d 492, 493, 494:

"It was not only the right *but the duty of the officer to seize the bill as a part of the arrest. It was a factor in the crime, and important proof of its commission.* The rule on the subject is stated as follows in 1 Bishop's Criminal Procedure, § 211:

" 'The arresting officer ought to consider the nature of the accusation; then if he finds on the prisoner's person, or otherwise in his possession, either goods or money *which he reasonably believes to be connected with the supposed crime, as its fruits, or as the instruments with which it was committed, or as supplying proofs relating to the transaction,* he may take and hold them to be disposed of as the court directs.'

"This statement is approved by the Supreme Court in Carroll v. United States, 267 U.S. 132, 158, 45 S.Ct. 280, 69 L.Ed. 543, 39 A.L.R. 790; Weeks v. United States, 232 U.S. 383, 392, 34 S. Ct. 341, 58 L.Ed. 652, L.R.A.1915B, 834, Ann.Cas.1915C, 1177. See, also, Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. [145], filed October 12, 1925.

"The same doctrine is laid down in Holker v. Hennessey, 141 Mo. 527, 42 S.W. 1090, 39 L.R.A. 165, 64 Am.St. Rep. 524; Ex parte Hurn, 92 Ala. 102, 9 So. 515, 13 L.R.A. 120, 25 Am.St.Rep. 23; Getchell v. Page, 103 Me. 387, 69 A. 624, 18 L.R.A.,N.S., 253, 125 Am.St.Rep. 307.

"*It is the duty of the officer making an arrest to take money or other articles connected with the crime, or evidencing its commission, from the person of the defendant, or from his possession or control, and hold, the same subject to the order of the court. In this case the officer had the same right to take the marked bill from defendant's cash register as from his pocket. The extent of*

the search and seizure at the time of arrest must depend to some extent upon the nature of the crime.

"See, in addition to the above authorities, Ash v. Commonwealth, 193 Ky. 452, 236 S.W. 1032; Ragland v. Commonwealth, 204 Ky. 598, 265 S.W. 15; Sayers v. United States [9 Cir.], 2 F.2d 146; Brady v. United States [6 Cir.], 300 F. 540.

"Considering our increasing failure in dealing with crime, there is the highest wisdom in the following statement of the Supreme Court in Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L. Ed. 543, 39 A.L.R. 790:

" 'The Fourth Amendment denounces only such searches or seizures as are unreasonable, and it is to be construed in the light of what was deemed an unreasonable search and seizure when it was adopted, and in a manner which will conserve public interest as well as the interests and rights of individual citizens.' " (Italics added.)

And see: Sayers v. United States, 9 Cir., 1924, 2 F.2d 146, 147; Carroll v. United States, 1924, 267 U.S. 132, 45 S. Ct. 280, 69 L.Ed. 543, 39 A.L.R. 790; Agnello v. United States, 1925, 269 U.S. 20, 30, 46 S.Ct. 4, 70 L.Ed. 145; United States v. Poller, 2 Cir., 1930, 43 F.2d 911; Foley v. United States, 5 Cir., 1933, 64 F.2d 14; Landau v. United States Attorney, 2 Cir., 1936, 82 F.2d 285; Whitcombe v. United States, 3 Cir., 1937, 90 F.2d 290; United States v. 71.4 Ounces Gold Filled Scrap, 2 Cir., 1938, 94 F.2d 17; United States v. David, 7 Cir., 1939, 107 F.2d 519; Shettel v. United States, 1940, 72 App.D.C. 250, 113 F.2d 34; United States v. Salli, 2 Cir., 1940, 115 F.2d 292; Turner v. Camp, 5 Cir., 1941, 123 F.2d 840; Cheng Wai v. United States, 2 Cir., 1942, 125 F.2d 915; Bozel v. Hudspeth, 10 Cir., 1942, 126 F.2d 585, 587.

'Mankind United' or of other pamphlets and called it a day".

A search for burglar's tools is entirely different from a search for ideological tools aimed to interfere with the conduct of the war.

The conspiracy charged, with the nature of which the officers were familiar, accuses the defendants of conspiracy to print, publish, and circulate and cause to be circulated throughout California and the United States, bulletins, weekly messages, telegrams, brochures, pamphlets, books, charts, and so forth, in obstruction of the war effort.

The tools of such an undertaking are different from the jimmy and torch of the burglar or safecracker or the dies of the counterfeiter. The first consist of thoughts and ideas which may require study and a sound understanding before their true meaning is ascertained. The second are physical in nature and are easily detected.

Truly, words may conceal thoughts. And in these days of subtle propaganda, words apparently innocuous may carry the sting and poison of an arrow to him who understands their true meaning.

To arrive at this and at the proper relationship of a variety of writings to a conspiracy of the kind charged here, requires time and a study of the paraphernalia and trappings of the conspiracy, whatever their form.

██ The pamphlets seized were patently seditious, as is evident from the excerpts in the introductory statement of facts. If circulated by the defendants after the United States' entry into the war, they would tend to achieve the mischief denounced by Section 33 of Title 50 U.S. C.A. The concerted efforts of the defendants in their distribution and circulation would tend to prove the conspiracy punished by Section 34, Title 50 U.S.C.A. Not only the pamphlets themselves, but any documents which showed participation of the defendants in their circulation and distribution, would constitute instrumentalities of the crime and connect them with its commission.

Officers who are making an arrest on a charge of this character, cannot, when searching incidentally, be expected to take into their possession, indiscriminately, whatever is in sight. Rather, as a part of their right and duty to search, must they segregate from what is in view objects which have a bearing on the charge from those unrelated to it.

The Government has admitted that many of the articles taken were not connected with the offense. It may well be that, at the trial, some of the material which the Government now desires to retain may be found to be in the same category. Ultimately, however, the test is not admissibility. An officer may take possession of a pamphlet which he thinks is related to so wide a conspiracy, although the court might exclude it at the trial as harmless or innocuous. And we should not invalidate the search merely because the officers tried to use some judgment, although they may not have used the same judgment which one skilled in the law, acquainted with the rules of evidence, and who could assay each parcel, would have exercised. If we concede that officers may take only objects which are actually pertinent to the offense with which the person is charged, and, at the same time, deny them the right to examine documents, we are creating a rather incongruous situation for them. For, in effect, we tell them that they have the right to search and seize, in the abstract, but, in the concrete, we forbid them to exercise it with good judgment, by placing a time limit upon them and by telling them, "You may stay only an hour", or "Three hours is too long to search premises." We, thus, destroy the effectiveness of their search and invite unrestrained explorations.

In determining this matter, we must disassociate ourselves from any thought as to the wisdom of the procedure. Personally, I think that no search without a warrant should be conducted by an officer of the United States. And this policy should control official action in a case of this character which lends itself easily to misconception and in which an enlightened public opinion keeps watch.

In fact, I can very well repeat as expressing my thoughts of today the words with which I concluded the article already referred to:

"The strength of our legal system lies in the fact that it is based upon the rule of law. It has been said that the chief aim of the modern State is 'to uphold the rule of law'. We who are charged with the administration of justice must uphold the rule of law. It will not do to say that the persons against whom these practices are used are anti-social—persons who vio-

late the law. The very test of our rule of law lies in its application to those who come in conflict with the law. If we deny its application to them, it ceases to exist for any of us. In giving them the full benefit thereof, we do it, *not for them*, but *for ourselves* * * *

"In these days, when we hear so many complaints about disrespect for law, it is sound social policy to heed the warning of those who, like Mr. Justice Brandeis, feel that nothing encourages such disrespect, as the lawless acts of the guardians of the law—those charged with its enforcement.

"And it is also good ethics to demand in those charged with law enforcement civilized behavior."[12] (Italics added.)

But policy is one thing, legality is another. I find no rule which says that when a person makes an arrest, he must take only the first objects which strike his attention. I know of no principle which says that when he finds one object which suggests that other articles might be there, he has no right to "follow up". If that were true, then we might say,—in the case of a conspiracy to violate the Internal Revenue Act,—that if an Internal Revenue Agent arrests a person in his home and finds him in possession of boxes of chopped marijuana, he may not go out into the yard and look for growing marijuana and clip a few leaves to produce, in evidence, later on.

Hence, my conclusion that the officers acted within the law in making these arrests, and that the documents and articles which they seized and have not returned bear on the conspiracy here charged. The mere fact that others were taken which the Government of the United States has decided to return does not destroy the legality of the searches and seizures.

I add that the photographs produced in evidence indicate that it would be apparent to any person entering into the particular places that they were being used, not for ordinary residential purposes, but as business places, from which the dissemination of the books and pamphlets charged in the indictment was being conducted.

The motions to suppress evidence and the motion to return will, therefore, be denied, and each of the defendants allowed an exception.

[12] IX So.Cal.Law Rev. pp. 32–33.