Filed 2/2/24  P. v. Hopkins CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MICHAEL AARON HOPKINS,<br><br>    Defendant and Appellant. | F084042<br><br>(Kern Super. Ct. No. MF013604A)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John R. Brownlee, Judge.

Robert L.S. Angres, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans, and Carly Orozco, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant was convicted of several crimes after sexually abusing the 10-year-old sister of his ex-girlfriend. He contends a pretext call with the victim's mother was involuntary and inadmissible due to coercion. We reject this contention. He further argues, and the Attorney General concedes, that his conviction for continuous sexual abuse must be reversed pursuant to Penal Code section 288.5, subdivision (c). We accept this concession and will reverse the conviction for continuous sexual abuse but otherwise affirm.

## BACKGROUND

On January 20, 2022, the Kern County District Attorney filed an amended information charging defendant with continuous sexual abuse of a child under 14 (count 1; Pen. Code, § 288.5, subd. (a)),[1] seven counts of oral copulation or sexual penetration of a child 10 or under (counts 2, 8–13; § 288.7, subd. (b)), and five counts of sexual intercourse or sodomy with a child 10 or under (counts 3–7; *id.*, subd. (a).) The information further alleged that counts 5 through 7 were committed under circumstances that triggered the "One Strike" Law (§§ 667.61 et seq.).

On January 21, 2022, a jury convicted defendant as charged. The jury further found that, as to counts 5 through 7, defendant tied or bound the victim at the time of the offense (§ 667.61, subd. (e)(5)), and inflicted bodily harm (§ 667.61, subd. (d)(7).)

On March 8, 2022, the court sentenced defendant as follows: 25 years to life on count 3, a stayed (§ 654) term of 12 years on count 1, seven consecutive terms of 15 years to life on counts 2 and 8 through 13, and four consecutive terms of 25 years to life on counts 4 through 7.[2] Combined, the sentenced totaled 230 years to life in prison, plus a stayed term of 12 years.

---

[1] All further undesignated statutory references are to the Penal Code unless otherwise stated.

[2] The reporter's transcript indicates the court pronounced sentence on count 7 twice, once as 15 years to life and once as 25 years to life. The abstract of judgment reflects a sentence of 25 years to life on count 7.

**FACTS**

Jane Doe was born in January 2008. Doe met defendant when she was nine or 10 years old, when he was dating her older sister, Adrianna. Doe would go to defendant's house every weekday and would spend the night three nights per week while he babysat. This continued even after defendant and Adrianna broke up.

One time while Doe was naked in the shower, defendant opened the door and got into the shower. Defendant put his fingers in Doe's vagina. Doe told him to stop, but he did not.

Later that night, defendant also put what Doe believed to be a purple "butt plug" into Doe's "butt." He did this on more than five different nights. Doe would cry and tell him to stop, but defendant would say she wanted it and would not stop.

Defendant later used a metal item to penetrate Doe in the same fashion as the purple item. Doe was still 10 years old when this occurred.

On a different night, defendant penetrated Doe's "butt" with his penis. This occurred multiple times, but Doe could not remember precisely how many times. Doe was still 10 years old when these incidents occurred.

On a separate occasion, defendant also put a vibrating, pink object in Doe's "butt."

Defendant would have Doe come to his room so he could sleep with her. When Doe would say no, defendant would persist until she agreed. She would stay the whole night in defendant's room, and he would touch her "everywhere" including her "private parts." Defendant touched her "butt" and her vagina. The touching happened "[a]lmost every night. All the time." Defendant would also regularly "lick" her vagina.

Defendant would also hit Doe with a whip and place handcuffs on her wrists. While Doe was bound by handcuffs, defendant placed his tongue in her vagina. He would hold her down and she was too weak to get out from under him. Defendant had Doe wear something "like almost underwear … except it was like … a leash you would

3.

put on a dog." Defendant would blow smoke in Doe's ears and mouth. Defendant would hit Doe with his hand, causing bruises.

When Doe would say he was hurting her, he would tell her to stop being a baby. At some point, defendant said he would kill Doe's mother if she said anything.

Doe testified she was 10 years old during "all of the incidents" – meaning when they started and when they stopped.

Doe waited to tell anyone until she knew she would not see defendant again.

On September 6, 2019, Sergeant Sean Mountjoy attempted to interview Jane Doe. Sergeant Mountjoy learned that crimes may have been committed against her, however, it was difficult to get details because she was crying.

**Pretext Call**

Jane Doe's mother, Laura, agreed to do a pretext call to get defendant to admit what he had done. Sergeant Mountjoy told Laura what type of admission they were looking for and encouraged her not to threaten with violence or blackmail. The pretext call occurred on September 10, 2019.

The pretext call begins with Laura saying she wanted to coordinate with defendant about getting M.H. back to him. Defendant asks, "[W]hat about [L.H.]?" to which Laura responds that she is with her mother. Defendant says L.H. needed to come home too, and Laura said he would need to talk to Adrianna.

Laura said she wanted to know what was going on before she brought M.H. home. She said, "[T]his is unacceptable, and I need you to tell me what's going on." Defendant replied, "I don't even f[**]king know."

Laura said, "I want to know what you did to [Doe], from you, now." Defendant replied, "[W]hat the f[**]k, why am I being accused of this shit?" Laura replied, "[S]he knows things and she's told me things that no child should know. None. Not even if they watched the worst porn on the planet." Laura said, "[Y]ou need to tell me what's going on, you mother[**]ker." Defendant insisted he did not know what was going on.

4.

Whispering can be heard in the background before Laura says, "I don't want to have to call the police department. But [Doe] is turning into a puddle because of all this business that's going on. And she keeps telling me things, and telling me things. But I'm going to send him to CPS because you don't deserve him if you can't give me the right information or give me any information." Defendant said M.H. needed to come home so he could go to school. Defendant said he thought his kids were already in CPS. Laura said, "Yeah, we've been dealing with CPS because [Doe] talked to a counselor at school." Laura continued, "But I have been able to keep them from going there. But I won't put forth any more effort …."

Defendant expressed surprise that his kids were being kept from him, but not by the State of California. Laura said, "No, they're being kept from you by me. So give me some information and I'll let you have one." Defendant said that was "f[**]king bullshit" and "if I call the police, you've kidnapped my son." Laura replied, "[G]o right ahead there, honey.

Laura said, "[W]hat have you been doing to my daughter? She told me that you put your d[*]ck in her ass. She told me in such an explicit way, that there is no possible way she didn't have it happen to her." Sergeant Mountjoy can be heard whispering, "[O]ral copulation." Laura then said, "[O]r how about you licking her vagina?"

Whispering is again heard, and then Laura said, "I don't wanna call the cops but I'm going to." Defendant replied he was "pissed off" and tired and worried sick. Laura called him a pedophile, to which defendant responded he "wanted his motherf**king kids back."

Laura said, "So, let me get this straight. Originally when I told you you were disgusting and you were disappointing and you said, 'I understand.' What did you mean by that?" Defendant responded that no matter what he said or did, she would not believe him.

5.

Laura said she had always been in defendant's corner, but he disagreed. During defendant's response, Sergeant Mountjoy whispers, "[T]hat has nothing to do with this."

Sergeant Mountjoy whispers something to Laura beginning with, "I don't want to have to call the cops …." Laura then says, "You know, I just really wanted to know what happened over the last few months just so [Doe] and I can start healing over this situation. Obviously, it's obvious that something happened to her. The emotional state that she's in, there's no possible way that she's lying. There's none. She needs to heal. If I know what's going on and what has happened, then I can help her heal without having to drag everybody and their mom through the mud." Laura said, "[P]lease, please, please just tell me so that she and I can start working ourselves through this." Defendant replied, "I want my kids back." Laura said, again, "[P]lease."

Defendant responded, "[Y]ou know what, your daughter asked me questions, I gave her answers." Laura replied, "[W]hy would you give her that type of answer?" Sergeant Mountjoy then whispered, "[W]hat questions?" Laura then said, "[W]hat kind of questions?" Defendant said she would not leave him alone.

Sergeant Mountjoy whispered something that ended, "…if it was her idea." Laura said, "So was this whole thing her idea?" Defendant said he did not know and that he did not do anything.

Laura said, "[S]o it was her idea to sleep in your bed? And it was her idea for you to touch her in the shower?" Defendant responded that the kids slept in the bed because they did not want to be near each other, and they had their own pillows and blankets. Defendant added he was awake most of the night.

Defendant said "she" would ask him questions in the middle of the night. Sergeant Mountjoy then whispered something. Laura then said, "So, I'm still confused because you're saying that she was asking you to show her adult things?" Defendant replied, "No she was asking me adult questions. And I answered the questions." Defendant insisted he did not doing anything and said he was "so f[**]ing pissed off" and

6.

"f[**]king tired of this." Laura asked what type of adult questions Doe was asking. Defendant said he did not remember.

Laura said, "I don't know. I think it would be best for me just to call the Sheriff's Department and have them file a report. Because there is too much information from [Doe]. I don't feel – I haven't gotten any information from you at all. And I don't feel comfortable with having [M.H.] come over there. So unless you can give me exact information … about what's going on, I will just call CPS." Sergeant Mountjoy whispered again. Laura then said, "[H]oney if you just made a mistake, we can work through this, ok?" Laura again said that if she did not get information, she would make a police report.

Defendant said, "[T]he mistake was having anybody over here at all, but my own kids. I think that was my first mistake." Sergeant Mountjoy whispered, "[W]hat was your second mistake?" Laura then said, "[W]hat was your second mistake?" Defendant said his second mistake was not shoving them all in their room, no matter how much they pleaded or fought with each other.

Sergeant Mountjoy then whispered something that included, "I have to know." Laura said, "[Y]ou don't seem to understand how important it is for me to know this information for her to heal." Laura again that said unless defendant provided information, she would call the sheriff's department.

Sergeant Mountjoy then whispered, "[D]id she ask you to touch her?" Laura said, "[D]id she ask you to touch her? Did she ask you to teach her those things?" After a pause of several seconds, Laura reiterated, "[D]id she?" Defendant said, "[G]ive me a second. I haven't eaten much today and I don't feel so great. So pissed off .…"

Sergeant Mountjoy then whispered something that began with, "[E]xplain that's what happened to you .…" Laura then said, "[Y]ou know, sometimes kids make mistakes, too. And they ask for adult things to happen to them, and when they have them happen to them they realize that it didn't make them feel good and then they do stupid

7.

things. Is that what happened? She asked you to touch her like that and do those things with her and then now she feels yucky and is wanting to turn it around?" Laura said if she did not know what happened, then Doe would keep telling people and "all of us are gonna be in trouble." Defendant asked, "[C]an we video chat?" Mountjoy whispered, "[M]ake sure it doesn't get me." Laura said she would call back.

Laura and Sergeant Mountjoy briefly conversed. Mountjoy said that defendant may want to confirm no one else was present with Laura. Laura said she would do her best and Mountjoy said she was doing "phenomenal." Mountjoy said, "[J]ust don't look at me."

Laura and defendant resumed via video call, but only the audio of the call was admitted into evidence.[3] Laura began the call by reiterating that she needed to know what was going on and that Doe was telling her things she should not know. Defendant said he was making himself something to eat. Laura said she wanted to keep everyone out of trouble. She said that "the longer this goes on" the more likely "all of us are going to go to jail."

Defendant said that throughout the school year, she would come home with questions. Laura asked, "[H]ow come she knows about things that you have in your drawer, like vibrators and butt plugs and stuff like that? How come she knows … about an outfit that you bought for Adrianna that you made her wear, she says." Defendant said Doe knew about the outfit because it was in his sock drawer.

Laura asked why Doe had said defendant had touched and licked her vagina. Defendant remained silent. Laura said that Doe needed psychiatric care, which would lead to her "giving out information" that would bring police and CPS to "our doorsteps. Yours also. Especially yours."

---

[3] While this was technically a separate call from the previous one, it was merely to switch from audio-only to video. Therefore, we will refer to the entirety of this conversation as "the" pretext call.

Defendant said, it "all started with questions" about Adrianna. Laura asked, "[B]ut why did you do them with her?" Defendant responded, "[S]he asked." Laura questioned, "[S]he asked you to do them with her?" Defendant responded, "Yes, over and over and over and berated me." Laura asked why he would do those things with her. Defendant replied, she "caught me at my lowest points." He followed up, "[B]ecause she was always there at my lowest points.… She was the only one of them that was there at my lowest points. She caught me at my lowest points."

Laura said she needed to know specifics so she could catch Doe in lies. Defendant replied, "[T]ouching, yes. Licking, a couple of times." Laura asked what he touched and licked. Defendant said, "[F]ront and back." Laura said, "[F]ront and back what?" Defendant said, "[L]ike her butt." Laura said, "[S]o you licked her butt and you licked her--?" Defendant replied, "[Y]eah." Laura said, "[B]ecause she asked you to?" Defendant replied, "[A]t one of my lowest points, yes." Laura then asked, "[Y]ou stick your d[*]ck in her ass because she asked you to?" Defendant replied, "[W]ell she continued asking me to until I did it."

Laura asked if it crossed defendant's mind to talk to her about this. Defendant asked, "[H]ow am I supposed to talk to anybody about that?" Defendant said he had been having a breakdown "all weekend."

Defendant reiterated that he had been at a low point and had been "drinking and smoking myself into retardation on top of everything else."

Laura said that anal sex is painful for adults, let alone a child, so "you can't tell me she didn't cry and she didn't say no." Defendant said, "[A]pparently, for a fairly long time, she's been playing with her own ass, from what she had told me."

Defendant denied telling Doe he would hurt Laura if she told someone.

Laura said, "[Y]ou have to know that there's going to be backlash. You have to know that. I mean, I'm going to do my best to detour that because she obviously needs a lot of help."

Laura said, she had to ask one last question, "[A]re you sorry that this happened?" Defendant eventually said he was sorry it ever happened and that he regretted it all happening. He said Doe was adamant about not leaving him alone and catching him at the wrong times, "pushing and pushing and f[**]king pushing."

**Mountjoy's Interview of Defendant**

Later that day (Sept. 10, 2019) Sergeant Mountjoy went to defendant's house and interviewed him.

A recording of the interview begins with Sergeant Mountjoy asking defendant what the allegations against him were. Defendant responds, "I'm guessing sexual assault of a minor."

Sergeant Mountjoy asked if he would come to station to talk about it and defendant responded, "I guess." Mountjoy asked if he wanted to go inside and grab shoes and a shirt, and defendant responded affirmatively.

Defendant asked, "[A]m I allowed to tell anyone what's happening?" Sergeant Mountjoy said, "[W]e're going to talk, man. If you don't wanna talk, you can tell me to F off right now, that's fine." Defendant asked if he could let his little brother know. Mountjoy said, "[I]f you'd like – save you some time – we can just talk here for now." Defendant said, "[I]f we go anywhere I have to message now." Mountjoy said, "[O]k we won't go anywhere, we can just go in your kitchen or whatever and chit-chat, alright? Does that sound good?" Defendant responded, "I guess."

Sergeant Mountjoy reminded defendant that he had previously said he was familiar with the sexual assault allegations against him. Defendant asked what Mountjoy wanted to know. Mountjoy said he did not know if "it" happened and expressed hope defendant would "be straight" with him. Defendant said, "Well, I was highly intoxicated; under the influence of two different substances … very high quantity of marijuana and alcohol." Defendant said he was at an extremely low point and was being constantly berated.

10.

Defendant said Doe asked him to do "things." When asked to be more specific defendant said, "[T]o touch her." Mountjoy asked, "[S]o like while you were intoxicated, you kind of delved [*sic*] into it? Her berating." Defendant replied, "[Y]eah, I gave in." Defendant said he felt like he made a mistake and that it never should have happened.

Sergeant Mountjoy asked him to say what happened between him and Doe. Defendant said he did not want to go into details. Mountjoy said Doe said defendant had "put [his] penis into her anus." Mountjoy asked if this was true, to which defendant replied, "[U]nfortunately." Mountjoy asked how many times that happened, and defendant said "a few" and then said "three."

Sergeant Mountjoy said Doe had also said defendant had orally copulated her. Defendant indicated that was true and had happened a few times.

Sergeant Mountjoy asked defendant how old Doe was when "this was happening." Defendant replied, "[T]en, eleven."

Sergeant Mountjoy asked defendant why he was being honest now. Defendant replied, "Well, it could go roundabout I could just be lying … and just make things worse for myself or just … accept it now and dig my grave now."[4] Mountjoy said he respected that.

Defendant said his children would not be able to come home and hoped that M.H. would eventually go to defendant's mother. Defendant did not want M.H. going to M.H.'s mother. Sergeant Mountjoy asked that, for now, defendant temporarily transfer custody of "[M.H.]" to "[G]randma Laura." Defendant agreed.

After the interview, Mountjoy arrested defendant.

---

[4] Defense counsel asserted, and the prosecutor acknowledged, this portion of the recording was played twice for the jury at trial. Defendant moved for a mistrial, which the court denied.

**Further Investigation**

On September 19, 2019, Sergeant Mountjoy again interviewed Doe. Doe was visibly distressed, crying, and trembling. While the conversation was still "rough," Doe did "substantially better" during this second interview. Doe described different items defendant had in his home. She described a pair of "cop handcuffs" and "old-fashioned shackles." Doe said defendant placed a butt plug or sodomizer while she was in shackles. Doe said defendant hit her with a whip while having anal sex with her.

Based on this second conversation with Doe, Sergeant Mountjoy authored a search warrant for defendant's residence. On September 19, 2019, Mountjoy searched defendant's bedroom and found a duffel bag with handcuffs, shackles, butt plugs, dildos, whips, and lingerie.

**Defendant's Testimony**

Defendant testified that he dated Doe's sister, Adrianna, from September 2016 to October 2018, and had a daughter with her named L.H. Defendant had three other children, including M.H. In 2019, M.H. and L.H. lived with defendant.

Before and after his relationship with Adrianna, defendant was also in a relationship with Adrianna and Doe's mother, Laura.

Defendant testified he regularly used sex toys with Adrianna while they were together, including anal toys, butt plugs, handcuffs, and a whip. Defendant took photographs of sexual encounters with Adrianna, and those photographs remained on his phone in September 2019. One time, defendant caught Doe looking at these photographs on his phone.

L.H. and M.H. were supposed to visit L.H.'s grandfather and return to defendant on a Sunday night. However, they did not return as of several days later. Defendant attempted to contact Laura and Adrianna through phone calls, text message and Facebook Messenger. Adrianna did not respond. Around this time, defendant was drinking alcohol

and smoking marijuana heavily. Defendant was also having trouble sleeping and was emotionally distraught.

Laura sent defendant "threatening messages" saying defendant had done "something" to Doe and mentioning potential child protective services (CPS) involvement. Defendant became worried.

Defendant testified about the pretext call with Laura. Defendant understood some of Laura's comments on the call to be her threatening to take his children away. These comments made defendant feel "stressed … out." Defendant told Laura what he thought she wanted to hear. Defendant thought that was the only way he could get his children back. Defendant thought he and Laura were the only people on the call and did not know Sergeant Mountjoy was with Laura.

At trial defendant denied molesting Doe, but he admitted to telling Laura that he had molested Doe. Defendant said he thought that was "the information that she wanted."

When the police came to defendant's house, he was still worried about getting his children back. Defendant told police he had engaged in sexual acts with Doe. Defendant testified he was telling them what they wanted to hear.

Defendant denied "anally raping" Doe, putting sex toys in her private areas or using whips to hit her.

On cross-examination, defendant said he used a white and black whip on Adrianna, but that the other whips were not used and were "collecting dust." Defendant had never used on Arianna the whip Doe claimed defendant had used on her.

## DISCUSSION

### I. The Court did not Err in Admitting the Pretext Call

Defendant contends the court erred in failing to suppress the pretext call and his interview with Sergeant Mountjoy.

13.

### A. *Background*

Before trial, defendant moved to suppress the pretext call and his interview with Sergeant Mountjoy. Conversely, the prosecution moved to admit this evidence. The court held a hearing under Evidence Code section 402, at which Mountjoy testified.

#### 1. Mountjoy's Testimony at the Evidence Code Section 402 Hearing

##### a. *Pretext Calls*

Sergeant Mountjoy testified that he interviewed Doe and Laura[5] on September 6, 2019. Mountjoy knew M.H. and L.H. were staying with Laura at the time.

Sergeant Mountjoy spoke with Laura about doing a pretext call with the defendant. They went over what a pretext phone call is, what evidence could potentially be gained from it and the "general workings" of a pretext phone call. Mountjoy also discussed tactics, such as saying they want to get "help" for the person they are speaking with. At no point did Mountjoy tell Laura to threaten defendant. Specifically, Mountjoy never discussed or instructed Laura to threaten to call law enforcement if defendant did not tell her what happened. Mountjoy did not discuss threatening to call CPS if he did not tell her what happened.

Sergeant Mountjoy was concerned defendant could sexually violate his other children. Mountjoy told Laura he was comfortable with her keeping custody of M.H. and L.H.

The pretext call occurred on September 10, 2019, while Sergeant Mountjoy was present with Laura in her home. Mountjoy reiterated what he had previously told Laura.

During the call, Sergeant Mountjoy did not work closely with Laura on what she should say specifically. Mountjoy did not give Laura a script and knew that Laura would not have followed a script even if he had given her one. Mountjoy gave her some ground

---

[5] According to counsel, Laura passed away before trial.

rules to run with and he let her run the call. Mountjoy told Laura to allow her parental emotions to make it "true and real." He gave her less information about what to ask because he wanted the call to be genuine.

Sergeant Mountjoy did not instruct Laura to tell defendant that she needed to know what was going on before she brought the other children home. Mountjoy did not even know she would say that.

### b.    *Interview*

Sergeant Mountjoy testified that when he began interviewing defendant on September 10, 2019, they were in the kitchen. Two sheriff's department vehicles were in the vicinity that could be seen from defendant's residence. However, three or four vehicles had responded in total.

Defendant was not in handcuffs, was not being held at gunpoint, and had not been told he was under arrest. Sergeant Mountjoy asked if defendant would speak with him and defendant agreed. At one point defendant asked if he could go to his bedroom and get his shoes. Mountjoy allowed him to do so freely but did accompany him. Defendant returned and directed Mountjoy to the kitchen table, so Mountjoy sat at the table.[6] Later, defendant said he wanted to get a glass of water from his bedroom. He did so, while a deputy accompanied him. No deputies were displaying their firearms or any other weapons. Defendant returned to the table and the conversation resumed.

At no point was defendant handcuffed or physically restrained in any fashion. Defendant was never told that he could not leave, nor was he told he must answer Sergeant Mountjoy's questions. However, defendant was not free to call or text message anyone.

On cross-examination, Sergeant Mountjoy acknowledged that before interviewing defendant he told one of his partners, "I'm going to need you to go to Boron to fill out

---

[6] Subsequent testimony indicated it may have been Sergeant Mountjoy's idea to sit at the kitchen table.

transfer of custody for me on – and he's going to talk. My God, he's f[**]ked. Dude, it's a life case."[7] Before he interviewed defendant, he had determined he would be arresting defendant.

### c.    *Court's Ruling*

The court denied defendant's motion to suppress the pretext call. The court determined Laura was not acting as an agent of law enforcement. The court further found that any promises or threats she made were not at the direction of law enforcement. And the things Sergeant Mountjoy did tell Laura to say were not coercive. Consequently, the court found by a preponderance of the evidence that the confession/admissions were voluntary.

The court also denied the motion to suppress defendant's interview with Sergeant Mountjoy. The court noted that the suspect's home is the least coercive setting where individuals feel the most unrestrained. The court observed that there were no handcuffs nor displays of weapons. The court noted there were only three officers in the home and the interview only lasted 15 minutes. Defendant was told he did not have to speak with Mountjoy but was forthcoming, nonetheless. Defendant's movement was not restricted, though he was escorted when he left the kitchen area. The court found *U.S. v. Mittel-Carey* (1st Cir. 2007) 493 F.3d 36, distinguishable because the interview in that case occurred at 6:25 a.m., lasted 90 to 120 minutes, involved eight law enforcement officers (one of whom unholstered his gun in the defendant's darkened bedroom), and the interrogating officer made coercive statements. (See *Mittel-Carey*, *supra*, 493 F.3d at p. 40 [finding those specific facts to be dispositive, among others].)

---

[7] At trial, this portion was not played for the jury because the prosecutor had redacted it. The defense moved for a mistrial. The prosecutor said she had redacted this portion because of an in limine motion prohibiting any mention of penalty or punishment. The court denied the motion for a mistrial.

16.

### 2.	Law

The Fourteenth Amendment's due process clause prohibits the admission of involuntary confessions.  (*People v. Neal* (2003) 31 Cal.4th 63, 67.)  "To determine the voluntariness of a confession, courts examine ' "whether a defendant's will was overborne" by the circumstances surrounding the giving of a confession.'  [Citation.]  In making this determination, courts apply a 'totality of the circumstances' test, looking at the nature of the interrogation and the circumstances relating to the particular defendant."  (*People v. Dykes* (2009) 46 Cal.4th 731, 752.)

Important here, the due process clause is a restriction on the government.  (U.S. Const., 14th Amend. ["nor shall any *State* deprive any person of life, liberty, or property, without due process of law …" (italics added)].)  Consequently, even "[t]he most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible under the [d]ue [p]rocess [c]lause."**[8]** (*Colorado v. Connelly*, *supra*, 479 U.S. at p. 166.)

We review the court's factual and credibility determinations for substantial evidence.  (*People v. Dykes*, *supra*, 46 Cal.4th at p. 752.)  We independently review the legal conclusion as to voluntariness.  (*Ibid*.)

### 3.	Analysis

As noted above, the court determined Laura was not acting as an agent of law enforcement.  The court further found that any promises or threats she made were not at

---

**[8]** Some older California Supreme Court decisions have held the opposite, that even confessions coerced by private citizens can somehow violate the due process clause's prohibition on state action.  (See, e.g., *People v. Haydel* (1974) 12 Cal.3d 190, 197–198; see also *People v. Berve* (1958) 51 Cal.2d 286, 293, overruled on another point by *People v. Cahill* (1993) 5 Cal.4th 478, 509, fn. 17.)  However, as defendant acknowledges, the People subsequently passed Proposition 8 in 1982, which only permits exclusion of evidence when mandated by the federal Constitution.  (See *People v. Broome* (1988) 201 Cal.App.3d 1479, 1492.)  And the Supreme Court has made clear that the conduct of private citizens does not render evidence inadmissible under the federal due process clause.  (*Colorado v. Connelly* (1986) 479 U.S. 157, 166.)

the direction of law enforcement. And the things Sergeant Mountjoy did tell Laura to say were not coercive.

The court's factual findings were supported by substantial evidence. Sergeant Mountjoy testified he never told Laura to threaten defendant, including to threaten to call law enforcement or CPS. He further testified that, during the call, Mountjoy did not work closely with Laura on what she should say specifically and did not give her a script. Mountjoy's testimony supplied substantial evidence supporting the trial court's factual determination.

Defendant contends otherwise, citing to the transcript of the call for the proposition that Sergeant Mountjoy gave Laura "guidance and support."[9] But defendant offers little more than the record citation itself. Even assuming this rises to level of contrary evidence, it is immaterial on substantial evidence review. " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.' " (*People v. Perez* (1992) 2 Cal.4th 1117, 1124.)

Defendant argues that Laura coerced the statements from him by refusing to return his children unless and until he explained the details of his sexual interactions with Doe.

_____

[9] A federal appeals court appears to have held that all that is needed to create an agency relationship in this context is that the government sought and obtained the person's "cooperation." (*Randolph v. California* (9th Cir. 2004) 380 F.3d 1133, 1144.) While the opinions of intermediate federal courts can be persuasive, they are not binding. (*People v. Brooks* (2017) 3 Cal.5th 1, 90.) And we do not find *Randolph*'s expansive conceptualization of agency to be persuasive. Victims and their relatives very often "cooperate" with law enforcement, but not all "cooperation" creates an agency relationship.

We do not endeavor to lay out a comprehensive framework for determining agency in the present context. Instead, it suffices for present purposes to conclude that offering some limited coaching on a pretext call does not render the caller a government agent at least when the officer does not coach/direct the caller to engage in coercive tactics.

However, the trial court found that any promises or threats Laura made were not at the direction of law enforcement, and that she was not an agent of law enforcement. Consequently, it is irrelevant whether Laura – a private citizen – engaged in tactics that, if they had been done by a police officer, would have been impermissibly coercive under the due process clause. (See *Colorado v. Connelly*, *supra*, 479 U.S. at p. 166.)

Defendant cites the probation report[10] for the claim he was not particularly sophisticated about legal matters, had no prior criminal history, had an 11th grade education, and was on welfare. While these factors may be relevant to determining whether *Laura* was able to overcome defendant's will through coercive means, it does not change the fact that Laura was a private citizen.

Defendant has failed to show the court erred in determining the evidence did not violate the due process clause.[11]

## II.     The Conviction on Count 1 Must be Reversed

Defendant contends, and the Attorney General concedes, that his conviction on count 1 must be reversed. Because defendant was charged with several acts of substantial sexual conduct during the same time period as the alleged continuous sexual abuse, he cannot stand convicted of both under Penal Code section 288.5, subdivision (c). Consequently, we accept the Attorney General's concession and will reverse the conviction on count 1. (See *People v. Torres* (2002) 102 Cal.App.4th 1053, 1057–1060.)

Defendant also requests, and the Attorney General agrees, that we must strike certain fees related to count 1. We accept this concession and will strike the $40 fee

---

[10] Given our resolution of this argument, we do not address the parties' dispute concerning the propriety of citing the probation report here.

[11] Therefore, we also reject defendant's claim that the court improperly admitted evidence traceable back to the pretext call as "fruit of the poisonous tree." As noted above, there was no poisonous tree here. (See *People v. Mickey* (1991) 54 Cal.3d 612, 652 ["no poison, no taint."].)

pursuant to Penal Code section 1465.8 and the $30 fee pursuant to Government Code section 70373 imposed for count 1.

## DISPOSITION

We vacate the conviction on count 1, strike the $40 fee pursuant to section 1465.8, and strike the $30 fee pursuant to Government Code section 70373.  The trial court shall prepare and forward to all appropriate parties a certified copy of an amended abstract of judgment.  So modified, the judgment is affirmed.


POOCHIGIAN, Acting P. J.

WE CONCUR:


SMITH, J.


DE SANTOS, J.

20.